**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION ) <br> FOR LATINO COMMUNITY ) <br> ASSET BUILDERS, ) <br>    5404 Wurzbach Road ) <br>    San Antonio, TX 78238, ) <br> ) <br>          Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CONSUMER FINANCIAL ) <br> PROTECTION BUREAU, ) <br>    1700 G Street NW ) <br>    Washington, DC 20552, ) <br> ) <br>          Defendant. ) <br> ) | Case No. 20-3122 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.     Plaintiff National Association for Latino Community Asset Builders (NALCAB) brings this action under the Administrative Procedure Act (APA) to challenge a final rule (Repeal Rule) issued by the Consumer Financial Protection Bureau (CFPB) in 2020 to rescind consumer-protection measures that the agency had adopted less than three years before.

2.     In 2017, the CFPB issued a rule, known as the Payday Lending Rule, addressing payday loans, auto-title loans, and other similar short-term or balloon-payment loans. Lenders often offer these types of loans without reasonably determining that borrowers have the ability to repay, a practice that may leave consumers in long, expensive, and harmful cycles of unaffordable debt. The CFPB determined that this practice (no-underwriting lending) is both unfair and abusive, and accordingly adopted measures to restrict it.

3.     The 2020 Repeal Rule revokes the CFPB's determination that no-underwriting lending is unfair and abusive and allows the practice to continue, to the detriment of consumers. The Repeal Rule invents a new evidentiary standard—distinct from any statutory requirement— and changes the CFPB's interpretation or application of the statutory definitions of unfair and abusive. These changes are not supported by reasoned explanations and appear custom-designed to repeal the ability-to-repay protections of the 2017 Payday Lending Rule. Moreover, in promulgating the Repeal Rule, the CFPB repeatedly failed to consider the harms that consumers suffer from no-underwriting lending. The CFPB also used an arbitrarily truncated analysis, confined in most cases to data from the Payday Lending Rule, and made no attempt to fill in what it identified as gaps in the record for the 2017 rule. The Repeal Rule unreasonably ignores or dismisses available data and research, and rests on unsupported assertions about consumer preferences and choice. Additionally, the Repeal Rule relies on analysis and addresses data not previously made available for comment. For these and other reasons, the Repeal Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and was also promulgated without observance of rulemaking requirements.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

5.     Venue is proper under 28 U.S.C. § 1391(e).

## PARTIES

6.     Plaintiff NALCAB is a nonprofit, membership association of mission-driven community and economic development organizations that serve diverse Latino communities in 40 states, Washington, D.C., and Puerto Rico. NALCAB works to strengthen the economy by advancing economic mobility in Latino communities. One way in which NALCAB achieves this

mission is through training, technical assistance, and grants to build the capacity of nonprofits and government entities to implement programs advancing economic mobility in low- and moderate-income communities. Through its initiative to advance family financial capability, NALCAB helps organizations create and strengthen financial coaching and other programs to help consumers understand credit and credit scores, access financial services and products, and avoid predatory practices, with the aim of enabling consumers to build their credit history, increase their savings, and reduce their debt. NALCAB commented on the CFPB's proposed Repeal Rule.

7.      In communities that NALCAB and its members serve, no-underwriting lending saddles many consumers with loans that they cannot afford to repay. The unaffordable loans put families deeper in debt, serving as a barrier to families' ability to increase their savings or reduce their debt. As a result of no-underwriting lending, organizations served by NALCAB need more assistance from NALCAB to be able to help families avoid or get out of unaffordable payday and title loans. NALCAB has already expended resources to address the harm caused by no-underwriting lending practices, such as by offering training for nonprofit organizations' executives and staff on how to recognize no-underwriting lending and guide clients out of the debt cycles that no-underwriting lending creates. Because of the Repeal Rule, NALCAB will have to continue expending resources to address no-underwriting lending, which it would not have to expend if the Payday Lending Rule's restrictions on no-underwriting lending went into effect. Without the Repeal Rule, NALCAB would be able to reduce the resources it spends on addressing no-underwriting lending and to spend resources on other efforts, such as training nonprofits on other ways that they can help families increase their savings, reduce their debt, and increase their credit scores.

8.      Building Skills Partnership (BSP) is a nonprofit organization and member of NALCAB. BSP works to improve the quality of life of low-wage property service workers and their families by increasing their skills, access to education, and opportunities for career and community advancement. To advance this mission, BSP runs a financial capability program that, among other things, provides one-on-one financial coaching to low-wage workers, to help those workers build their assets and achieve their long-term financial goals. BSP's one-on-one coaching requires more time, per person, to help individuals achieve certain goals, when they are struggling with payday-loan debt that they cannot afford to repay. If the provisions of the 2017 Payday Lending Rule rescinded by the Repeal Rule were in effect, fewer individuals in the BSP program would be struggling with unaffordable payday-loan debt, and BSP would therefore be able to devote more time to other clients or activities. Alternatively, BSP could work with the same clients to advance additional financial coaching goals. In light of the Repeal Rule, more clients in BSP's financial coaching program will continue to need assistance addressing unaffordable payday-loan debt, and BSP will need to continue devoting extra resources to providing such assistance, taking away BSP's resources from other clients, activities, or assistance to existing clients.

9.      Defendant CFPB is an agency of the federal government. It issued the 2020 Repeal Rule.

## BACKGROUND

**Payday and auto-title loans**

10.      Payday loans and auto-title loans are types of short-term loans. They are often made to consumers in financial distress, with fees that may amount to annual percentage rates of 300 percent or more.

11.     A payday loan generally requires a borrower to repay the loan in a single payment, often two weeks or a month later, when the borrower receives his or her next paycheck or government benefits payment. Payday lenders require borrowers to provide post-dated checks or electronic access to their bank accounts. In this way, when payment is due, lenders can seek to recoup funds without additional interaction with the consumer.

12.     In an auto-title loan, the lender "retains the vehicle title or some other form of security interest that provides it with the right to repossess the vehicle." 82 Fed. Reg. 54,472, 54,490 (Nov. 17, 2017). If a borrower defaults, the lender can seize the borrower's vehicle to sell in order to pay off the loan. Title loans typically have 30-day terms.

13.     In "virtually every other credit market," lenders succeed when their borrowers do, by repaying their loans. *Id.* at 54,623. Payday and title lenders, however, have business models that rest on consumers *not* repaying their loans. Often advertising easy access to cash, payday and auto-title lenders generally do not assess borrowers' ability to repay loans. Many consumers who receive no-underwriting loans are unable to repay them when due.

14.     When a borrower lacks funds to repay a payday loan, title loan, or similar loan by its original due date, the borrower has three options. The first option, called reborrowing, is to take out a new loan to repay the old one, either by "rolling over" the original loan or by paying it off and taking out a new one shortly after (either of which incurs a new loan fee). The second option is to default. The third option is to repay the loan and, because the borrower could not actually afford to do so, "fail to meet basic living expenses or other major financial obligations." *Id.* at 54,472.

15.     Consumers suffer significant harm from reborrowing, default, or unaffordable payments. Reborrowing requires a borrower to pay a new loan fee and sets a new repayment date,

with no reduction in principal. Reborrowing can thus turn a single short-term, small-dollar loan into a months-long series of multiple loans, with no path to repayment and fees that surpass the original amount borrowed. Delinquency and default harm borrowers in other ways. Lenders pursue borrowers with aggressive debt collection efforts that can lead to psychological distress and jeopardize a borrower's employment. And lenders' attempts to collect overdue payments can saddle borrowers with additional fees, charged by the lenders themselves or by the borrowers' banks (when lenders make unsuccessful attempts to debit borrowers' accounts). Title-loan borrowers who default can lose their vehicles. The CFPB described this consequence as "dire," noting that it can have a "severe toll on the consumer's economic situation if it affects their ability to get to work or carry on a variety of everyday household affairs." *Id.* at 54,604. And if borrowers choose to make unaffordable loan payments to avoid these consequences, they may end up forgoing "basic living expenses." *Id.* at 54,591. The inability to escape these options can lead to other significant types of distress. Recent research links payday loans, as currently offered, to a variety of negative health outcomes, including suicide.

16.     Payday and title lenders depend on borrowers being unable to afford their loans. Reborrowing is the lifeblood of the industries. *See id.* at 54,622. The CFPB analyses supporting its 2017 rule showed that, for storefront payday lenders, "90 percent of all loan fees comes from consumers who borrowed seven or more times." *Id.* at 54,484. The title-loan market's "reliance on re-borrowing activity appear[s] to be even greater." *Id.* at 54,494. More than four out of five payday and title loans are reborrowed within a month, *id.* at 54,554-55; and, about a third of initial payday or title loans end up in borrowing sequences that include seven or more loans, *see id.* at 54,555, 54,565, 54,566. The fees from reborrowing help offset relatively high default rates. *See id.* at 54,483-84. CFPB research showed that about 20 percent of payday-loan sequences and 33 percent

of title-loan sequences end in default, often after the borrower has reborrowed at least once (and thus paid extra fees before defaulting). *See id.* at 54,555, 54,572, 54,573. Twenty percent of title-loan sequences end with the lender repossessing the consumer's vehicle. *See id.* at 54,573.

**Statutory background**

17.    In the wake of the 2008 financial crisis, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010) (Dodd-Frank Act). Title X of the Dodd-Frank Act created the CFPB as an independent regulator focused on consumer protection, and empowered the CFPB to implement and enforce existing consumer protection laws and new ones. The CFPB director has authority to "prescribe rules and issue orders and guidance, as may be necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof." 12 U.S.C. § 5512(b)(1).

18.    Congress charged the CFPB with protecting consumers from unfair, deceptive, or abusive acts or practices (UDAAPs). *See id*. § 5511(b)(2). The Dodd-Frank Act includes an express prohibition on UDAAPs, *id.* § 5536(a)(1)(B), and states that the CFPB may "prescribe rules … identifying as unlawful" UDAAPs connected to consumer financial products or services and may issue "requirements for the purpose of preventing such acts and practices," *id.* § 5531(b).

19.    To define unfairness, the Dodd-Frank Act states that "[t]he Bureau shall have no authority under [section 5531] to declare an act or practice … to be unlawful on the grounds that such act or practice is unfair, unless the Bureau has a reasonable basis to conclude that" the act or practice satisfies two standards: the act or practice (1) "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers," and (2) "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." *Id.*

§ 5531(c)(1). Additionally, the Act states that "[i]n determining whether an act or practice is unfair, the Bureau may consider established public policies as evidence to be considered with all other evidence." *Id.* § 5531(c)(2).

20. The Dodd-Frank Act defines abusiveness as follows:

The Bureau shall have no authority under this section to declare an act or practice abusive in connection with the provision of a consumer financial product or service, unless the act or practice—

(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

(2) takes unreasonable advantage of—

(A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

(B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or

(C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

*Id.* § 5531(d).

21. Recognizing that payday loans "put[] many consumers on a perpetual debt treadmill where they extend the loan several times over," S. Rep. No. 111-176 at 21 (2010), Congress also singled out payday loans for special attention in the Dodd-Frank Act. Congress gave the CFPB certain "exclusive authority" among federal regulators regarding a subset of non-depository financial companies, 12 U.S.C. § 5514(c), (d), and it included all payday lenders on that list, *id.* § 5514(a)(1)(E).

**The 2017 Payday Lending Rule**

22.     In 2017, the CFPB adopted the Payday Lending Rule to identify and address two unfair and abusive practices in the markets for payday, auto-title, and certain similarly structured loans. *See* 82 Fed. Reg. 54,472.

23.     The first practice that the Payday Lending Rule identified as unfair and abusive is no-underwriting lending: making "covered short-term loans or covered longer-term balloon-payment loans without reasonably determining that consumers will have the ability to repay the loans according to their terms." 12 C.F.R. § 1041.4 (2020). The set of loans at issue included payday loans, title loans, and other loans requiring substantially the entire amount be repaid in a single payment within 45 days; certain balloon-payment loans with longer terms; and other similarly structured loans. *Id.* §§ 1041.2(a)(7), (10), 1041.3(b)(1), (2). The Payday Lending Rule excluded widely used forms of traditional credit, such as credit cards, mortgages, and student loans, as well as some emerging credit models. *See id.* § 1041.3(d).

24.     The Payday Lending Rule explained that no-underwriting lending is unfair because it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers" and that injury "is not outweighed by countervailing benefits to consumers or competition," 12 U.S.C. § 5531(c)(1). The rule also concluded that public policy is consistent with identifying no-underwriting lending as unfair. The "substantial injury" at stake included the harm "associated with default, delinquency, and reborrowing, as well as the negative collateral consequences of being forced to forgo major financial obligations or basic living expenses to cover [an] unaffordable loan payment." 84 Fed. Reg. at 54,591.

25.     The CFPB concluded that no-underwriting lending is abusive based on two of the four alternative definitions of abusive stated in the Dodd-Frank Act. Specifically, it concluded that

the practice "takes unreasonable advantage of … a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service," and that it "takes unreasonable advantage of … the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service," 12 U.S.C. § 5531(d)(2).

26.     The Payday Lending Rule included a set of requirements, referred to herein as Ability-to-Repay Protections, to address no-underwriting lending. First, with regard to the loans at issue and with certain exceptions, the 2017 rule prohibited a lender from making a loan without making a reasonable determination that the consumer would have the ability to repay it according to its terms. *See* 12 C.F.R. § 1041.5(b) (2020). Second, the rule restricted sequences of borrowing to three loans. *See id.* § 1041.5(d). Third, the rule provided a "principal step-down" option, under which, instead of satisfying the ability-to-repay requirement, lenders could offer certain no-underwriting loans with restrictions. Through the principal step-down option, the CFPB placed limits on the amount of principal a lender could offer, restricted the length of loan sequences and the number of loans that a lender could make to a borrower in a year, and required related disclosures. *See id.* § 1041.6. Fourth, the rule established a system of "Registered Information Systems," a new type of CFPB-registered entity that would receive data from lenders about the relevant loans and share such data with lenders seeking to comply with the Ability-to-Repay Protections. *See id.* §§ 1041.5(c)(ii)(B), 1041.6(a), 1041.10, 1041.11. Fifth, the rule included recordkeeping and related requirements. *See id.* § 1041.12.

27.     The Payday Lending Rule also identified as unfair and abusive, the practice of making three or more "attempts to withdraw payment from consumers' accounts," absent authorization, after two consecutive attempts fail "due to a lack of sufficient funds." *Id.* § 1041.7. These UDAAP identifications applied to the same loans as the Ability-to-Repay Protections, as

well as to additional longer-term loans. To address this unfair and abusive practice, the rule generally prohibited third or further withdrawal attempts without additional authorization, required related disclosures, and included recordkeeping and related requirements. *See id.* §§ 1041.8, 1041.9, 1041.12 (Payment Protections).

28.    The CFPB adopted the Payday Lending Rule following a comment period that generated more than 1.4 million comments and after more than five years of research and study. The five years of research included review of the CFPB's internal supervisory, enforcement, and consumer complaint data; outreach to stakeholders; a series of CFPB research reports on loans covered by the rule; and consumer testing of proposed disclosures. The Payday Lending Rule described, in detail, borrower characteristics, lender practices, patterns of loan sequences and defaults, and the harms that result, despite existing state-level regulatory efforts.

29.    In issuing the Payday Lending Rule, the CFPB concluded that it would bring substantial benefits to consumers by restricting harmful practices. Among other things, the CFPB concluded that the rule would prevent payday and title lenders from trapping consumers in long sequences of unaffordable loans, leading borrowers to pay fees, over and over, for new loans when they cannot repay their first loans according to their terms. The CFPB also recognized that the Ability-to-Repay Protections would require changes by lenders making payday and title loans. For instance, the CFPB estimated that if lenders continued to offer loans on their existing terms, they would not be able to make those loans to many of the borrowers to whom they lend now, because those individuals cannot afford the loans. Lenders also would not be able to continue rolling over loans, beyond a three-loan sequence. As a result, the CFPB estimated, if lenders continued to offer loans on the same terms as previously, their loan volumes and revenues would drop. The CFPB recognized, however, that its estimate of a reduction in loan volume was an overestimate, for

multiple reasons, including that lenders would likely adjust their product terms to be able to continue more lending under the new rule. Lenders could, for example, offer smaller loans that are affordable or offer installment (rather than balloon) payments.

30.     When the CFPB issued the Payday Lending Rule, it set an effective date of January 16, 2018. On that date, entities could begin applying to become Registered Information Systems, in advance of lenders implementing the Ability-to-Repay Protections. That date was also the deadline for the Office of Management and Budget (OMB) to make a decision on the Paperwork Reduction Act (PRA) request that the CFPB had submitted to OMB regarding certain "information collections" incorporated into the Payday Lending Rule. The compliance date for the bulk of the rule's provisions was August 19, 2019.

**The CFPB's efforts to weaken the Payday Lending Rule**

31.     The CFPB finalized the Payday Lending Rule under the leadership of then-director Richard Cordray. On November 24, 2017, following Cordray's resignation, President Trump designated Mick Mulvaney to serve simultaneously as the CFPB's acting director and the director of OMB.

32.     Mulvaney did not support the Payday Lending Rule. As a member of Congress, Mulvaney had sought to eliminate the CFPB and introduced a bill to limit the CFPB's authority to regulate payday and title lending. After becoming the CFPB's acting director, Mulvaney promptly began efforts to dismantle the Payday Lending Rule. Less than two weeks into his tenure, he had asked staff to brief him on options to address the rule and expressed support for a Congressional Review Act (CRA) resolution to void it.

33.     On January 16, 2018, the CFPB announced its intention to reconsider the Payday Lending Rule and invited entities seeking to become Registered Information Systems to seek

waivers of an upcoming deadline (which the CFPB began granting, with no end date). Also on January 16, 2018, OMB did not make a decision on the CFPB's PRA request.

34.     In April 2018, two industry associations sued the CFPB in the U.S. District Court for the Western District of Texas seeking to overturn the Payday Lending Rule. In May 2018, the CFPB, agreeing with the industry plaintiffs, asked the court to stay both the Payday Lending Rule and the litigation. CFPB attorneys had initiated the conversation with opposing counsel that led to such agreement on May 17, 2018, the day after the end of the period in which Congress could have passed the CRA resolution to overturn the Payday Lending Rule.

35.     The CFPB also began efforts to undo the rule through rulemaking. According to an internal memorandum provided to the press, CFPB staff were informed that a decision had been made to revoke the Payday Lending Rule or replace it with disclosure requirements, "without any request to" the division head "or staff for an analysis of the evidentiary and legal bases for the rule." *See* Nicholas Confessore & Stacy Cowley, *Trump Appointees Manipulated Agency's Payday Lending Research, Ex-Staffer Claims*, N.Y. Times (Apr. 29, 2020), https://www.nytimes.com/ 2020/04/29/business/cfpb-payday-loans-rules.html (see link to memo, with entry for May 31, 2018). According to press reports, after being advised that, legally, he "had little basis on which to delay" the Payday Lending Rule, Mulvaney had directed staff to come up with arguments to replace the rule based on a "challenge" to its "underpinnings." Nicholas Confessore, *Mick Mulvaney's Master Class in Destroying a Bureaucracy from Within*, N.Y. Times (Apr. 16, 2019), https://www.nytimes.com/2019/04/16/magazine/consumer-financial-protection-bureau-trump.html.

36.     In October 2018, the CFPB announced that it intended to issue proposals regarding the rule's compliance date and the Ability-to-Repay Protections.

37.     On February 14, 2019, the CFPB published two rulemaking proposals. The CFPB proposed to delay the Payday Lending Rule's August 2019 compliance date, as applied to the Ability-to-Repay Protections. *See* 84 Fed. Reg. 4298 (Feb. 14, 2019) (Delay Proposal). And the CFPB proposed to eliminate the Ability-to-Repay Protections. *See* 84 Fed. Reg. 4252 (Feb. 14, 2019) (Repeal Proposal).

38.     The Repeal Proposal attacked the "underpinnings" of the Ability-to-Repay Protections. Focusing principally on critiquing two studies cited in the Payday Lending Rule, the Repeal Proposal asserted that, due to the 2017 rule's impact, supporting evidence for that rule should have been "robust and reliable" and concluded that the evidence was not. The Repeal Proposal additionally set out purportedly new interpretations or applications of the Dodd-Frank Act's definitions of unfairness and abusiveness. Then, the Repeal Proposal suggested the CFPB's earlier rule did not satisfy those standards.

39.     The Repeal Proposal's application of its stated standards was limited, however. The Repeal Proposal focused on criticizing the record for the 2017 Payday Lending Rule. And although the Repeal Proposal asserted that the 2017 record did not satisfy what the CFPB proposed in 2019 *should have been* the standard, the CFPB did not attempt to fill the purported gaps in the record. The Repeal Proposal stated that it had taken into account some post-2017 input from stakeholders and comment letters responding to other recent CFPB efforts. But a CFPB official testified to Congress that the CFPB had not conducted any new research to justify the Repeal Proposal. The Repeal Proposal did not even reference recent internal CFPB supervisory or enforcement data. And although parts of the Repeal Proposal recognized new research linking payday loans to suicide and other severe health effects, the CFPB ignored that research in explaining why it sought to repeal the Ability-to-Repay Protections. Additionally, although the CFPB knew of new and in-

progress research that could be relevant to an analysis of whether no-underwriting lending is unfair and abusive, the Repeal Proposal stated that the CFPB was "not aware of any additional evidence that would provide the support needed for the key findings" underlying the Ability-to-Repay Protections and did "not believe it is cost-effective for itself and for lenders and for borrowers to conduct the necessary research." 84 Fed. Reg. at 4253.

40.     The Repeal Proposal also re-framed the Payday Lending Rule's earlier analysis and research. In some cases, the proposal walked back the CFPB's earlier assessment of particular research studies. In other cases, it ignored or downplayed the CFPB's earlier research and analysis. And in still other cases, it reflected the CFPB's earlier conclusions, but changed the wording to be more favorable to the proposal's goal. According to an internal memorandum provided to the press, CFPB research staff were encouraged or directed to shape their analysis of benefits and costs in ways that would make the analysis appear more favorable to the proposal or ignore much of the available research.

41.     The CFPB described its proposed evidentiary standard and some of its new interpretations or applications of the Dodd-Frank Act definitions in vague and confusing terms that did not enable the public to comment meaningfully on those aspects of the Repeal Proposal.

42.     On June 17, 2019, the CFPB published a final rule delaying the Ability-to-Repay Protections' August 19, 2019 compliance date until November 19, 2020. *See* 84 Fed. Reg. 27,907 (Delay Rule).

**The 2020 Repeal Rule**

43.     On July 7, 2020, the CFPB adopted the final Repeal Rule to rescind the Ability-to-Repay Protections. *See* 85 Fed. Reg. 44,382 (July 22, 2020).

44.     On the same day, the CFPB announced that it would move forward with implementation of the Payday Lending Rule's Payment Protections.

45.     The Repeal Rule rescinds the CFPB's identification of no-underwriting lending as unfair and abusive and, on the basis of that rescission, repeals the entirety of the Payday Lending Rule's Ability-to-Repay Protections. The Repeal Rule asserts that the CFPB's 2017 UDAAP identifications regarding no-underwriting lending must be rescinded due to concerns about their factual and legal bases.

46.     First, the Repeal Rule adopts the new evidentiary standard that the CFPB had earlier proposed. It concludes that the CFPB's identification of no-underwriting as unfair and abusive, or parts of that identification, must be supported by evidence that is "robust and reliable," rather than evidence that meets the applicable legal standard under the APA and the Dodd-Frank Act. The CFPB asserts that the new standard is necessary because of the "dramatic" impact of the Payday Lending Rule's remedy for no-underwriting lending, the Ability-to-Repay Protections. *Id*. at 44,399.

47.     Second, the Repeal Rule purports to change the CFPB's interpretation or application of the Dodd-Frank Act standards for identifying unfair and abusive practices.

48.     Third, the Repeal Rule asserts that the Payday Lending Rule's identifications of no-underwriting lending as unfair and abusive should be repealed because, even if the CFPB in 2017 satisfied the requirements of the Dodd-Frank Act and the APA in making those identifications, aspects of the CFPB's 2017 rule or 2017 record do not satisfy the new evidentiary standard and/or the Repeal Rule's interpretations or applications of the Dodd-Frank Act definitions.

49.     The Repeal Rule's new evidentiary and legal standards or applications of the Dodd-Frank Act definitions appear custom-designed to repeal the Ability-to-Repay Protections. They tilt

the scales in favor of industry, while reflecting no consideration of the ways in which they will harm consumers and conflict with the CFPB's consumer-protection objectives. The Repeal Rule repeatedly asserts or implies that the CFPB is not bound to use the Repeal Rule's standards elsewhere. The standards or their applications are also unreasonable, not supported by reasoned explanations, and/or in violation of the Dodd-Frank Act.

50.     In many additional ways, the Repeal Rule's analysis is inadequate to support its conclusion that the CFPB's UDAAP identifications should be repealed. The CFPB did not purport to analyze afresh whether no-underwriting lending is unfair or abusive under the CFPB's 2020 standards. Instead, similar to the proposal, the Repeal Rule focuses on criticizing the CFPB's 2017 analysis or 2017 record for not having met standards or applications of those standards that did not exist at the time. The rule fails even to consider more recent CFPB internal data that could shed light on the questions that the Repeal Rule concluded were inadequately addressed previously. The Repeal Rule's analysis of the 2017 record is also incomplete. For instance, the Repeal Rule concludes that the CFPB need not now consider some aspects of the 2017 record because of the relative weight that the CFPB placed on such aspects in 2017 (when the CFPB might not have needed to consider anything more, because its *2017* standards were satisfied). The Repeal Rule also unreasonably constrains its review in other ways, by limiting its analysis to the choices the CFPB made in 2017, without considering alternative ways in which the record could show that no-underwriting lending is unfair or abusive. Moreover, although the Repeal Rule identifies purported errors, it makes no attempt to address them. The rule ignores or rejects obvious alternatives, such as conducting research to address purported gaps in the factual basis for the Payday Lending Rule or adjusting the Ability-to-Repay Protections (rather than repealing them) to address any concerns about remedy. The CFPB does not provide a reasoned explanation for its rejections of alternatives.

For example, it relies on unsupported assumptions, internally contradictory statements, and unexplained changes in position.

51.     The Repeal Rule's use of data is also internally inconsistent. Despite its focus on the 2017 rulemaking, the Repeal Rule considers some post-2017 research or circumstances. The Repeal Rule does not explain its decision to consider new information in some cases but not others, and its choices are illogical. For instance, the Repeal Rule discusses recent lending-market changes, but ignores new data about borrowers' circumstances or the harms they suffer.

52.     The Repeal Rule fails to consider the history, purpose, and objectives of the CFPB, the ways in which the Repeal Rule conflicts with such history, purpose, and objectives, and the consumer harm that the rule will cause. The Repeal Rule casts aside much of the agency's extensive past research, experience, and analysis in favor of unsupported assertions.

53.     In adopting the Repeal Rule, the CFPB failed to respond to numerous significant comments, including comments about the importance of the Ability-to-Repay Protections, the harms caused by no-underwriting lending, flaws in the Repeal Proposal, and the characteristics and evolution of lending markets. The rule ignores some comments entirely, summarizes others without indicating a response, and in other cases, states its disagreement only in conclusory terms.

54.     The CFPB adopted the Repeal Rule in spite of requests to the agency that, in light of the coronavirus pandemic, the agency delay finalizing the rule or withdraw the proposed rule and allow the Ability-to-Repay Protections to take effect. The pandemic has put many Americans in more vulnerable financial circumstances. In issuing the Repeal Rule, the CFPB did not consider the effects of the pandemic, recognize the requests to delay or withdraw the Repeal Proposal, or explain why it denied those requests. The Repeal Rule also does not address requests by members

of Congress that, in light of reports of improprieties in the rulemaking process, an inspector general begin an investigation and the CFPB halt the rulemaking.

55.     The Repeal Rule addresses data, rationales, assertions, and legal analyses that were not discussed in the Repeal Proposal and that commenters could not have anticipated. For example, although the proposal asserted that the CFPB was focusing on the record of the 2017 Payday Lending Rule, the Repeal Rule makes assertions about some post-2017 data or circumstances and discusses research published since the close of the Repeal Proposal's comment period. The CFPB did not seek input on which studies released after the end of the comment period the agency should consider, release for comment the new studies that the Repeal Rule cites, or seek comment on all of the post-2017 data or circumstances that the Repeal Rule discusses. In addition, the Repeal Rule asserts that the Dodd-Frank Act definitions of unfair and abusive should be interpreted or applied in ways that are different from what the Repeal Proposal suggested, makes new assertions about consumers' preferences for payday loans and access to alternatives, and provides new details regarding how it interprets or applies its "robust and reliable" standard. The CFPB also did not give notice and an opportunity to comment on these points.

56.     The Repeal Rule took effect on October 20, 2020.

57.     The CFPB has not yet implemented the Payments Provisions.

**A.  The Repeal Rule's one-sided assessment of the Payday Lending Rule's effects.**

58.     The Payday Lending Rule extensively documented the harms that consumers suffer from no-underwriting lending. In issuing the rule, the CFPB concluded that "a substantial population of borrowers is harmed, many severely" by the injuries that result from no-underwriting lending, which "include those associated with default, delinquency, and re-borrowing, as well as

the negative collateral consequences of being forced to forgo major financial obligations or basic living expenses to cover the unaffordable loan payment." 82 Fed. Reg. at 54,591.

59.     The protections that consumers would gain from the Ability-to-Repay Protections (by avoiding such harm) outweigh any cost to consumers of those protections. The Repeal Rule has the converse effect: it will cause harm to consumers that outweighs any benefits to them. The Repeal Rule does not suggest otherwise. Flouting the objectives of the Dodd-Frank Act, the Repeal Rule allows lenders to continue causing such harm by offering unaffordable loans through an unfair and abusive practice. And in so doing, the Repeal Rule focuses on characterizations of the Ability-to-Repay Protections' impact that are one-sided and unsupported.

60.     In adopting the Repeal Rule, the CFPB repeatedly ignored the costs to consumers of no-underwriting lending and the Repeal Rule itself. The rule's preamble includes an analysis of the rule's benefits and costs, called its Section 1022(b)(2) Analysis, which recognizes that the Repeal Rule will harm consumers by allowing no-underwriting lending to continue. But the Repeal Rule's policy justifications do not reflect consideration of that harm. They ignore or contradict aspects of the Section 1022(b)(2) Analysis, as well as other information in the record about the costs of repeal to consumers, including data supporting the 2017 rule, comment letters, and recent research showing that payday loans (as offered in the current market) are associated with severe health effects.

61.     To the extent the Repeal Rule mentions the harms consumers will suffer from no-underwriting lending and the Repeal Rule, it understates those harms while overstating the stakes for industry. The Section 1022(b)(2) Analysis does not account for all of the rule's costs to consumers, ignoring some and unreasonably minimizing others. For instance, it tabulates the revenue at stake for industry, but it does not acknowledge that no-underwriting lending causes

consumers to pay more fees. It rejects certain research without identifying the research or providing anything more than a conclusory rejection. It addresses three studies released since the close of the comment period without explaining its choice to review those three studies and not others, and without addressing the full implications of those studies. It states that other new studies cited in the Repeal Proposal "do not affect the Bureau's analysis," 85 Fed. Reg. at 44,434, even though those studies link payday loans, as offered in the current market, to significant health effects not considered by the CFPB in 2017. The analysis also ignores the market failure that the Payday Lending Rule aimed to address, obscures the relative magnitudes of various impacts, and notes some effects in vague and unclear terms, without evaluating relevant research. Additionally, the Section 1022(b)(2) Analysis is unclear and inconsistent about which effects it is addressing, what past research it is relying upon, and whether or why it has departed from the Payday Lending Rule's approach.

62.     Instead of considering the harm it causes—and that the 2017 Ability-to-Repay Protections would prevent—the Repeal Rule emphasizes a different set of effects. The rule's policy justifications portray the Ability-to-Repay Protections as "eliminat[ing] most covered short-term and longer-term balloon payment loans." 85 Fed. Reg. at 44,399. The Repeal Rule then equates that result, unreasonably, with a "dramatic impact on consumer choice and access to credit that consumers prefer." *Id.* In other parts of the preamble as well, the Repeal Rule similarly equates restrictions on no-underwriting lending with harmful reductions in consumer choice, access, or preferred loans. The Section 1022(b)(2) Analysis also discusses the impact of the Ability-to-Repay Protections on lending volumes and revenue.

63.     The Repeal Rule's description of the Ability-to-Repay Protections' impact on lending volume contradicts the record and other aspects of the Repeal Rule and fails to consider

important factors. For instance, the assertion that the Ability-to-Repay Protections will eliminate most of the relevant loans fails to take into account the ways in which the Payday Lending Rule's quantitative estimates of its impact on lenders were overstated, including because lenders were likely to change their product offerings to make loans affordable to more consumers or offer loan products not covered by the rule. The Repeal Rule's discussion of the Ability-to-Repay Protections' impact ignores both the details of the CFPB's 2017 analysis and record material regarding lenders' ability to adapt their products, even while other aspects of the Repeal Rule discuss lenders changing the products they offer. When the Repeal Rule elsewhere discusses the Ability-to-Repay Protections' impact on lending, it similarly overstates the impact; even where it recognizes that lenders may adjust their products, it fails to acknowledge that such adjustment is "quite likely," 82 Fed. Reg. at 54,835.

64. The Repeal Rule's suggestion that a reduction in no-underwriting lending corresponds to harmful reductions in consumer choice, access, or preferred loans is not supported. The rule's assertions about consumer choice and access to credit fail to account for the harm that consumers experience from unaffordable loans. In making these assertions, the CFPB did not consider the type of credit at issue in the CFPB's 2017 rulemaking: mostly reborrowed loans, resulting from initial loans that consumers cannot afford to repay. The assertions also ignore the CFPB's history and objectives, which focus on preserving access to safe credit, not credit offered on any terms. Further, the assertions represent a significant change in position from 2017, when the agency "concluded that the overall impacts of the decreased loan volumes resulting from the [2017] rule for consumers will be positive," 82 Fed. Reg. at 54,818, and disagreed with the view that loans made through no-underwriting lending always represent consumers' preferences or result from unconstrained choice. The Repeal Rule does not recognize, explain, or support its

changes in position. Relatedly, the assertions conflict with the Repeal Rule's premise: the Repeal Rule discusses—but does *not* purport to reach new conclusions regarding—questions about whether consumers are informed when they receive no-underwriting loans and whether consumers can reasonably avoid the harm such loans cause.

65.     The Repeal Rule also mischaracterizes the stakes by stating that the Ability-to-Repay Protections would "stifle" innovation, 85 Fed. Reg. at 44,414. The rule recognizes that some current products do not comply with the Ability-to-Repay Protections (which are not in effect), but cites no data to support this or similar suggestions in the rule that eliminating such consumer protections is necessary to promote innovation (or that any such innovation benefits consumers). The rule does not consider whether the Ability-to-Repay Protections could promote innovation. The CFPB fails to explain why the aspects of the Ability-to-Repay Protections that provide exceptions for emerging lending models are insufficient to address the CFPB's concerns about innovation. The Repeal Rule also does not explain why the CFPB could not use other mechanisms, short of repeal, to address any concerns about fostering innovation. The Repeal Rule's policy justifications related to innovation are also inconsistent with the Section 1022(b)(2) Analysis.

**B.  The Repeal Rule's unreasonable evidentiary standard.**

66.     The Repeal Rule asserts that its new evidentiary standard, for "robust and reliable" evidence, is necessary in this context due to what the CFPB now describes as the "dramatic" impact of the Ability-to-Repay Protections on lending volumes and consumer choice and access. *Id*. at 44,399. This premise, regarding the 2017 rule's impact, is unreasonable for the reasons described above. Further, by relying on a one-sided analysis of the Ability-to-Repay Protections' impact, the "robust and reliable" standard unreasonably tilts the scales in industry's favor, contravening the history and purposes of the CFPB.

67.     The CFPB's creation and application of the standard is not reasonable or reasonably explained, on multiple other grounds. For instance, the "robust and reliable" standard is a solution that does not match the problem. The CFPB created the standard because of a concern about the Payday Lending Rule's remedy. But the CFPB uses the standard to undermine the identification of the unfair and abusive practice, not to adjust a remedy. The CFPB's adoption of the standard also reflects circular reasoning: the CFPB adopted the new evidentiary standard on the basis of unsupported assumptions about consumer decision-making—and then used the new standard to assess evidence regarding consumers' decision-making, including their ability to understand or avoid harm.

68.     The "robust and reliable" standard would also unreasonably favor industry if applied more broadly. The CFPB asserts that the standard is necessary because of the number of loans affected by the Ability-to-Repay Protections. But because any UDAAP rule related to loans will mean that some set of lenders must change their lending practices (or reduce the loans they provide), this principle would operate as a one-way ratchet in favor of the lending industry if applied generally. It would make it harder for the CFPB to issue a new UDAAP rule when it causes change for a large number of loans, even though such rules could also provide the most benefit to borrowers by restricting a widespread, harmful practice. The CFPB adopted the standard without considering its impact on consumers or the relationship to the CFPB's objectives.

69.     The CFPB appears to use the "robust and reliable" standard as a shorthand for dismissing any study it wishes to ignore. The Repeal Rule's descriptions of the standard are vague, illogical, and inconsistent, and its applications of the standard are unreasonable. The rule applies the standard to dismiss specific studies one by one, on a variety of bases. The bases are such that the CFPB does not make clear what research *could* satisfy the standard. For instance, the CFPB

applies the standard to ignore studies or data based on considerations such as the fact that a researcher's question did not precisely match the legal standard or the possibility that a single piece of data or research could be consistent with a different interpretation than what the CFPB reached in 2017 (even when such research also *supports* the CFPB's 2017 conclusions). Then, in applying the standard, the rule fails to consider the collective weight of the available evidence on a specific question. At the same time, the CFPB's use of the "robust and reliable" standard is inconsistent. In particular, when the Repeal Rule purports to make *affirmative* conclusions in favor of repeal, the Repeal Rule does so *without* applying its own "robust and reliable" standard.

       **C.  The Repeal Rule's rescission of the CFPB's unfairness finding.**

       70.     The Repeal Rule accepts the CFPB's 2017 conclusion that no-underwriting lending causes or is likely to cause substantial injury. It also does not question that the identification of no-underwriting lending as unfair is consistent with public policy.

       71.     The Repeal Rule asserts that the CFPB's identification of no-underwriting lending as unfair should be repealed based on concerns about the Payday Lending Rule's conclusions that (a) the substantial injury consumers suffer from no-underwriting lending "is not reasonably avoidable," and (b) "such substantial injury is not outweighed by countervailing benefits to consumers or to competition," 12 U.S.C. § 5531(c)(1).

       72.     The Payday Lending Rule interpreted the Dodd-Frank Act's "reasonably avoidable" criterion "to mean that unless consumers have reason generally to anticipate the likelihood and severity of the injury and the practical means to avoid it, the injury is not reasonably avoidable." 82 Fed. Reg. at 54,596. The rule found this standard satisfied on multiple grounds. The CFPB concluded, for instance, that "a large number of consumers do not understand even

generally the likelihood and severity of [the] risks" of injury from a loan made without underwriting. *Id.* at 54,598.

73.     The Repeal Rule states that harm is reasonably avoidable:

> if payday borrowers have an understanding of the likelihood and magnitude of risks of harm associated with payday loans sufficient for them to anticipate those harms and understand the necessity of taking reasonable steps to prevent resulting injury. Specifically, this means consumers need only understand that a significant portion of payday borrowers experience difficulty repaying and that if such borrowers do not make other reasonable arrangements they may either end up in extended loan sequences, default, or struggle to pay other bills after repaying their payday loan.

85 Fed. Reg. at 44,394. The Repeal Rule further explains its interpretation of the standard through its application, in evaluating the Payday Lending Rule's analysis.

74.     The Repeal Rule's interpretation of the "reasonable avoidability" criterion violates the Dodd-Frank Act and is unreasonable to the extent it means that a practice can be reasonably avoidable even when consumers are unaware that *they* may be among those harmed, potentially severely.

75.     For other reasons as well, the Repeal Rule's interpretation or application of the "reasonably avoidable" criterion is not reasonable or does not reflect reasoned decision-making. For instance, the Repeal Rule's formulation rests on a mischaracterization of the Payday Lending Rule. The Repeal Rule concludes that the CFPB's earlier interpretation was "problematic" and the new interpretation is "better," 85 Fed. Reg. at 44,395, without explaining why. The Repeal Rule asserts that a certain amount of information is necessarily enough to ensure that consumers "grasp the likelihood of risk," "appreciate the magnitude of those risks," and are able to avoid harm. *Id*. These assertions are made without support and without consideration of the circumstances of consumers in the current market, the details of the harm at issue, or lender practices. The Repeal Rule asserts that the inability to avoid harm "later" is "generally" not alone enough to satisfy this

element of unfairness, *id.* at 44,397; such a narrowing of the standard, without consideration of the circumstances of a particular practice, is unreasonable. This narrowed view of the standard is also unreasonable as the CFPB has attempted to apply it to loans at issue in this rulemaking, including because the Repeal Rule's analysis mischaracterizes the Payday Lending Rule by suggesting that it was only concerned with the first loan in a sequence of loans. In interpreting or applying the "reasonable avoidability" criterion, the Repeal Rule also misreads the case law it cites. Further, the Repeal Rule fails to consider the impact on consumers of its interpretation or application of the standard. To the extent the Repeal Rule suggests that no-underwriting lending is not unfair or that certain data should be ignored because the Ability-to-Repay Protections apply across the market, *see id.* at 44,401, the argument is illogical and does not acknowledge or explain the CFPB's change in position since 2017.

76.     The Repeal Rule concludes that the Payday Lending Rule record lacks "robust and reliable" evidence to support a finding that no-underwriting lending's harms are not "reasonably avoidable," under either the CFPB's 2017 standards or its 2020 description of "reasonable avoidability." The Repeal Rule's conclusions rest on mischaracterizations of the Payday Lending Rule's interpretation of the "reasonable avoidability" criterion and the CFPB's 2017 analysis. The Repeal Rule's "reasonable avoidability" analysis conflicts with the Repeal Rule's Section 1022(b)(2) Analysis. The Repeal Rule dismisses, downplays, or ignores particular research studies, other evidence in the record, or pertinent factors on unreasonable grounds or without explanation. It reflects an unexplained change in the CFPB's interpretation of relevant data. In addition to ignoring the consumer harm at issue, the Repeal Rule ignores evidence of market practices and borrowers' actual circumstances, and fails to consider the available evidence in combination. The CFPB unreasonably rejects concerns about borrowers' inability to avoid harm after receiving one

unaffordable loan or when taking out a second or further loan in a sequence of loans; among other things, the Repeal Rule mischaracterizes the Payday Lending Rule. The Repeal Rule's assertion that "[c]onsumers do not lack the practical ability to take advantage of … alternative" types of credit products, *id.* at 44,397, does not reflect consideration of the full record and relevant factors, including borrowers' ability to compare any available products. It also rests on a mischaracterization of relevant data, an unreasonable dismissal of data, and an unsupported assertion about consumer preferences.

77.     The Repeal Rule also criticizes the Payday Lending Rule's conclusion that the injury caused by no-underwriting lending outweighs any countervailing benefits of such loans to consumers and competition. In addressing this aspect of unfairness, the Payday Lending Rule considered the harm caused by no-underwriting lending, including the "acute harm" suffered by "[s]ubstantial groups of consumers," and concluded that the aggregate injury suffered "clearly outweighs" any benefits to such consumers, 82 Fed. Reg. at 54,606, as well as any benefits to competition, *see id.* at 54,612. The Payday Lending Rule's conclusion rested on a detailed analysis of the circumstances of three categories of borrowers and took into account the costs of remedy.

78.     The Repeal Rule asserts that in considering the costs of remedying no-underwriting's harms, the CFPB should have considered a hypothetical scenario, in which the 2017 rule's ability-to-repay requirement applies to all loans, rather than the expected scenario, in which lenders would take advantage of the principal step-down alternative (which imposes fewer restrictions on lending). The Repeal Rule describes its test as different than what the Payday Lending Rule applied and one that assumes *more* benefits from lenders continuing to offer no-underwriting loans (since it reflects a higher estimate of the cost to lenders of coming into compliance). The Repeal Rule also asserts that the CFPB in 2017 underweighted the benefits of

no-underwriting lending in other ways. Then, the rule concludes that the substantial injury that borrowers suffer from no-underwriting lending is outweighed by benefits to consumers or competition.

79.     The Repeal Rule's test for comparing no-underwriting lending's harms to its benefits contradicts the record and is illogical. For instance, the Repeal Rule's formulation rests on mischaracterization of the Ability-to-Repay Protections, an overestimate of the effects on industry of some of those protections, and an illogical distinction between the Ability-to-Repay Rule's *actual* remedy and the portion of that remedy that the Repeal Rule considers relevant. The Repeal Rule's reliance on a *hypothetical* remedy, in place of an actual one, to conclude that a practice's benefits outweigh its harms, is unreasonable.

80.     The Repeal Rule's conclusions about how benefits compare to costs are unsupported for other reasons as well. The rule purports to apply what it considers a re-formulated test to compare the harms of no-underwriting lending to the benefits to consumers or competition. But the Repeal Rule does not describe or analyze those harms and does not constitute a comparison. In addition, the Repeal Rule's discussion of the risk that lenders will deny or not offer loans that would be permitted under the Payday Lending Rule lacks a reasoned basis. The Repeal Rule does not consider how lenders will implement the Payday Lending Rule's ability-to-repay requirements in practice. The rule adopts the proposal's assertions about the CFPB's experience in other markets without describing that experience, explaining why it relates to the lenders covered by the Payday Lending Rule, or addressing the CFPB's knowledge of the markets at issue. The Repeal Rule ignores evidence of lenders' ability to adapt their business models, otherwise overstates the impact of eliminating no-underwriting lending, and provides no analysis of lenders' operations or business models. The Repeal Rule also fails to consider the relative magnitude of

various effects, rests on an unexplained change in the CFPB's interpretation of relevant data, and makes assertions about consumer preferences that also represent an unexplained and unsupported change in position. Regarding competition, the Repeal Rule's discussion reflects changes in the CFPB's assessment of the relationships among revenue, storefronts, and competition, without acknowledging or explaining the change; makes assertions about a reduction in competition and innovation that are unsupported; fails to consider lenders' ability to change their product terms; and conflicts with other aspects of the Repeal Rule.

**D.  The Repeal Rule's rescission of the CFPB's abusiveness finding.**

81.     The Payday Lending Rule identified no-underwriting lending as abusive on two alternative grounds: the practice takes unreasonable advantage of consumers' lack of understanding of the material risks, costs, or conditions of the relevant loans, and the practice takes unreasonable advantage of consumers' inability to protect their interests.

82.     Regarding the first finding, the Payday Lending Rule concluded that "a significant population of consumers does not understand the material risks and costs of unaffordable loans" made with no-underwriting lending. 82 Fed. Reg. at 54,617. The Payday Lending Rule relied on multiple sources of evidence to reach this conclusion and explained that the conclusion "does not mean that consumers are required to be experts in all aspects of how such loans function as a practical matter." *Id.* But, the rule explained, "if borrowers do not understand either their likelihood of being exposed to the risks of [the relevant] loans or the severity of the kinds of costs and harms that may occur, then it is quite difficult to maintain the position that those same borrowers in fact understand the material risks and costs associated with unaffordable short-term loans." *Id.*

83.     Regarding the second finding, the Payday Lending Rule concluded, based on a wide range of evidence and research, that borrowers are "unable to protect their interests in selecting or

using [no-underwriting loans] given the dynamics of this market and the structure and terms of these loans." *Id.* at 54,619.

84.    The Payday Lending Rule then concluded that no-underwriting lending takes unreasonable advantage of these two different types of vulnerability. The Payday Lending Rule's analysis of how lenders' advantage-taking is unreasonable was based on a detailed understanding of market practices. The rule observed, among other things, that "[g]iven that such a large majority of covered loans (over 80 percent) consist of loans procured through reborrowing, and given that this is the core of the business model, it is evident that lenders have very significant incentives to take advantage of consumers' lack of understanding" or inability to protect themselves in these markets. *Id.* at 54,622. "At a minimum," the CFPB concluded, "lenders take unreasonable advantage of borrowers when they develop lending practices that are atypical in the broader consumer financial marketplace, take advantage of particular consumer vulnerabilities, rely on a business model that is directly inconsistent with the manner in which the product is marketed to consumers, and eliminate or sharply limit feasible conditions on the offering of the product … that would reduce or mitigate harm for a substantial population of consumers." *Id.* at 54,623.

85.    The Repeal Rule critiques all three aspects of the Payday Lending Rule's abusiveness analysis. First, the Repeal Rule states that the "lack of understanding" element of the abusiveness standard "should be treated as similar to the requisite level of understanding for reasonable avoidability." 85 Fed. Reg. at 44,422. This interpretation or application of the standard is unclear and not based on reasoned decision-making. The Repeal Rule does not explain why the "lack of understanding" and "reasonable avoidability" standards should be "similar" or the extent to which it believes they are similar. While the Repeal Proposal stated a more specific formulation of the standard, the Repeal Rule does not state whether it adopted that formulation or another. The

Repeal Rule also does not explain why the CFPB believes that the Payday Lending Rule's interpretation of the standard should be changed (or the extent to which the CFPB believes that the Repeal Rule's interpretation or application of the standard is different). Further, the Repeal Rule's interpretation or application of this element of abusiveness violates the Dodd-Frank Act and is unreasonable to the extent it means that consumers have the requisite "understanding" (and a practice is therefore not abusive) even when consumers are unaware that *they* may be among those harmed, potentially severely.

86.     The Repeal Rule also concludes that the Payday Lending Rule's "lack of understanding" finding is not supported by robust and reliable evidence. The Repeal Rule does not specify which legal standard it applies to conduct this analysis or analyses. In any case, the Repeal Rule's conclusions are unsupported. For example, the Repeal Rule mischaracterizes the Payday Lending Rule and available data, and unreasonably ignores or dismisses evidence. The Repeal Rule's analysis conflicts with its Section 1022(b)(2) Analysis. To the extent the Repeal Rule's analysis of consumers' "lack of understanding" adopts its earlier analysis regarding "reasonable avoidability," the "lack of understanding" analysis is flawed for the same reasons as the earlier analysis.

87.     The Repeal Rule also changes the interpretation or application of the "inability to protect" element of abusiveness. The rule states that to satisfy the "inability to protect" criterion, consumers must have an inability to protect their interests before taking out a loan *and* after doing so. The rule applies this interpretation to exclude consideration of whether consumers are unable to protect their interests after receiving no-underwriting loans or when taking out second or further loans in sequences of loans. The new interpretation and application of the "inability to protect" standard violate the Dodd-Frank Act definition of abusiveness. That definition applies to any new

loan (whether in a sequence or not) and addresses the inability of consumers to protect their interests in "selecting" or "using" a financial product, 12 U.S.C. § 5531(d)(2)(B). Moreover, the Repeal Rule's re-framing of the "inability to protect" criterion rests on a mischaracterization of the Payday Lending Rule and represents an unacknowledged and unexplained change in position from the 2017 rule.

88.    The Repeal Rule asserts that the Payday Lending Rule's record did not contain "robust and reliable" evidence to support the conclusion that borrowers are unable to protect their interests. This assertion is not supported by a reasoned explanation. For example, the Repeal Rule's analysis rests on a mischaracterization of the Payday Lending Rule's analysis, as well as circular and conclusory assertions about consumers' decision-making, which represent unexplained changes in approach from the Payday Lending Rule. The Repeal Rule discusses alternatives without meaningfully considering whether payday- and title-loan borrowers perceive of, and are able to protect their interests through, access to such alternatives. It also fails to address important aspects of the problem and relevant data, including factors and evidence that the CFPB considered in 2017. The Repeal Rule also dismisses research and evidence on conclusory, vague, or unreasoned grounds. It fails to consider, in combination, all of the relevant evidence and analysis. It unreasonably dismisses consumers' inability to protect themselves from harm after they have received an unaffordable loan or when taking out a second loan in a sequence.

89.    The Repeal Rule additionally disputes the Payday Lending Rule's conclusion that no-underwriting lending takes unreasonable advantage of consumers' lack of understanding and inability to protect their interests. The Repeal Rule characterizes the Payday Lending Rule as using a four-factor test or analysis, then purports to conclude that under that four-factor analysis, lenders

do *not* take unreasonable advantage of consumers' lack of understanding or inability to protect their interests when they make no-underwriting loans.

90.     The Repeal Rule's analysis misconstrues the Payday Lending Rule's analysis, in multiple regards, and is unreasonable. Rather than establishing a four-factor test or analysis, the Payday Lending Rule examined the dynamics of the relevant lending markets as a whole and concluded that "the ways lenders have structured their lending practices here fall well within any reasonable definition of [the] concept" of taking unreasonable advantage. 82 Fed. Reg. at 54,623. While the Payday Lending Rule concluded that four aspects of the market dynamics combined were sufficient to establish the abusiveness of no-underwriting ending, the Repeal Rule provided no reasoned explanation for considering only those factors and discussing them individually, rather than in combination, in disputing or reversing the Payday Lending Rule's conclusions.

91.     In other ways as well, the Repeal Rule fails to provide a reasoned justification for dismissing the Payday Lending Rule's conclusion that lenders take unreasonable advantage of borrowers' lack of understanding and inability to protect their interests. For instance, the Repeal Rule's analysis begins by ignoring the particular vulnerabilities at issue here—consumers' lack of understanding or inability to protect their interests in the relevant markets—and failing to address how lenders' business models take advantage of those particular vulnerabilities. The Repeal Rule then states that various individual facts or pieces of data do not establish that no-underwriting lending is abusive. But it ignores extensive amounts of data in the record, relevant factors, and key aspects of the Payday Lending Rule's analysis; irrationally minimizes the uniqueness of payday- and title-lenders' failure to underwrite; rests on illogical analysis; focuses on raising hypotheticals that minimize lenders' advantage-taking and defeating irrelevant straw-men; and fails to consider facts and data in combination with each other. To the extent the Repeal Rule's analysis rests on

assertions about innovation and shifts in lending practices, it fails to consider pertinent aspects of the issues, conflicts with other parts of the Repeal Rule, or fails to support its conclusions. The Repeal Rule's suggestion that a more searching analysis is needed before concluding that acts or practices "take unreasonable advantage … simply because those acts and practices are atypical," 85 Fed. Reg. at 44,421, makes no sense because the Payday Lending Rule's conclusion did not rest on atypicality alone; the assertion is also unreasonable as it fails to account for the potential for "innovation" to harm consumers, rests on a hypothetical, and otherwise fails to explain why a change in the standard is appropriate when atypicality is involved. To the extent the Repeal Rule suggests in this analysis or elsewhere that no-underwriting lending is not abusive because the Payday Lending Rule applies across the market, the argument is illogical and does not acknowledge or explain the CFPB's change in position since 2017.

## FIRST CAUSE OF ACTION
### (Arbitrary and capricious agency action)

92.     The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

93.     The CFPB's explanation of the Repeal Rule is a pretext for a desire to serve payday and title lenders, contrary to the statutory mission of the CFPB.

94.     In adopting the Repeal Rule, the CFPB ignored critical factors and important aspects of the problem, including the harms that the rule will cause to consumers and the CFPB's history, purposes, and statutory objective to protect consumers from unfair and abusive practices.

95.     The Repeal Rule rests on characterizations of the Ability-to-Repay Protections' impact and assertions about innovation, consumer decision-making, preferences, choice, and access to credit that are incomplete and unsupported, and do not reflect reasoned decision-making.

96.     The CFPB based the Repeal Rule on a new evidentiary standard and interpretations or applications of the Dodd-Frank Act's definitions of unfair and abusive. These standards are vague, unsupported, unreasonable, and not reasonably explained.

97.     The CFPB's applications of its standards and its assessments of the Payday Lending Rule's analyses are arbitrary and capricious on multiple grounds. For instance, the Repeal Rule is based on arbitrarily truncated applications of the standards it asserts. The Repeal Rule applies its own standards inconsistently or unreasonably. The Repeal Rule's analyses mischaracterize the Payday Lending Rule; rest on unsupported, unreasonable, or conclusory justifications or assertions; ignore relevant data or considerations; fail to consider relevant pieces of data and evidence in combination with each other; conflict with other aspects of the Repeal Rule; and rest on illogical analysis.

98.     In adopting the Repeal Rule, the CFPB failed to provide a reasoned explanation for changing prior positions, disregarding prior factual findings, or adopting new factual findings that contradict those on which the Payday Lending Rule rested. The CFPB failed to consider information and arguments in the record. The CFPB made arbitrary and unreasoned choices about which information and research to consider. The Repeal Rule ignores or dismisses data and research without a reasonable basis for doing so.

99.     The Repeal Rule is a solution that does not match the purported problem. The CFPB did not consider or failed to provide a reasoned basis for rejecting alternatives.

100.    The CFPB failed to respond to significant comments.

101.    The Repeal Rule is arbitrary, capricious, or an abuse of discretion, in contravention of the APA.

## SECOND CAUSE OF ACTION
### (Violation of the Dodd-Frank Act)

102.    The APA empowers this Court to "hold unlawful and set aside" agency action that is "not in accordance with law." *Id.* § 706(2)(A).

103.    The Repeal Rule includes unlawful interpretations or applications of the Dodd-Frank Act's definitions of unfairness and abusiveness.

104.    The Repeal Rule is not in accordance with the Dodd-Frank Act.

## THIRD CAUSE OF ACTION
### (Violation of rulemaking requirements)

105.    The APA empowers this Court to "hold unlawful and set aside" agency actions taken "without observance of procedure required by law." *Id.* § 706(2)(D).

106.    The APA requires that an agency publish a notice of proposed rulemaking that includes "either the terms or substance of the proposed rule or a description of the subjects and issues involved" and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(b), (c).

107.    In adopting the Repeal Rule, the CFPB did not comply with APA requirements. The Repeal Proposal used vague and confusing terms that did not enable the public to comment meaningfully on the CFPB's proposed evidentiary standard or all of its interpretations or applications of the Dodd-Frank Act legal standards. The Repeal Rule relies on data, rationales, assertions, and legal analysis that were not discussed in the Repeal Proposal and that interested parties could not have anticipated.

108.    The Dodd-Frank Act requires the CFPB, in issuing a rule, to consider the "costs to consumers." 12 U.S.C. § 5512(b)(2)(A)(i). In adopting the Repeal Rule, the CFPB did not consider the costs to consumers.

109.   The CFPB adopted the Repeal Rule without the observance of procedure required by law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

A.   Declare the Repeal Rule unlawful;

B.   Set aside the Repeal Rule;

C.   Enjoin CFPB from implementing or enforcing the Repeal Rule;

D.   Order the CFPB to take necessary steps to ensure prompt implementation of the 2017 Payday Lending Rule's Ability-to-Repay Protections;

E.   Award plaintiff its reasonable costs and attorney's fees under 28 U.S.C. § 2412; and

F.   Grant such other relief as this Court deems just and proper.

Dated: October 29, 2020                          Respectfully submitted,

                                                 /s/   Rebecca Smullin
William R. Corbett (N.C. Bar No. 31463)          Rebecca Smullin (D.C. Bar No. 1017451)
Yvette Garcia Missri (D.C. Bar No. 488728)       Adina H. Rosenbaum (D.C. Bar No. 490928)
Center for Responsible Lending                   Public Citizen Litigation Group
302 West Main Street                             1600 20th Street NW
Durham, NC 27701                                 Washington, DC 20009
(919) 313-8500                                   (202) 588-1000
yvette.garciamissri@responsiblelending.org       rsmullin@citizen.org
will.corbett@responsiblelending.org

Rebecca K. Borné (D.C. Bar No. 986679)
*(application for admission*
*to this Court pending)*
Center for Responsible Lending
910 17th Street NW, Suite 500
Washington, DC 20006
(202) 349-1850
rebecca.borne@responsiblelending.org

Attorneys for Plaintiff