# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

National Association for Latino Community
Asset Builders,

    *Plaintiff,*

v.

Consumer Financial Protection Bureau,

    *Defendant.*

Civil Action. No. 1:20-cv-3122-APM

**DEFENDANT CONSUMER FINANCIAL PROTECTION BUREAU'S
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT
FOR LACK OF SUBJECT-MATTER JURISDICTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................ii

TABLE OF AUTHORITIES...........................................................................................iii

INTRODUCTION.............................................................................................................1

BACKGROUND...............................................................................................................3

      A.    The Consumer Financial Protection Act...................................................3

      B.    The 2017 Payday Rule...............................................................................3

      C.    The 2020 Revocation Rule.........................................................................4

      D.    The Instant Litigation................................................................................5

LEGAL STANDARD......................................................................................................6

ARGUMENT...................................................................................................................7

      I.    NALCAB's Allegations Regarding Its Standing Are Speculative........................8

      II.    NALCAB Has Failed to Allege That It or Any of Its Members Have Suffered a Cognizable Injury in Fact.................................................................................14

      A.    NALCAB Has Failed to Plausibly Allege That It Has Suffered a Cognizable Injury as a Result of the Repeal of the Mandatory Underwriting Provisions.....................................................................14

      B.    NALCAB Has Failed to Plausibly Allege that MEDA Has Suffered a Cognizable Injury as a Result of the Repeal of the Mandatory Underwriting Provisions.....................................................................29

CONCLUSION................................................................................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
   469 F.3d 129 (D.C. Cir. 2006) ............................................................... 15

*Action All. of Senior Citizens of Greater Philadelphia. v. Heckler*,
   789 F.2d 931 (D.C. Cir. 1986) ............................................................... 19

*Allen v. Wright*,
   468 U.S. 737 (1984) ............................................................................... 18

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
   946 F.3d 615 (D.C. Cir. 2020) ............................................................... 15

*Am. Lung Ass'n v. EPA*,
   985 F.3d 914, 990 (D.C. Cir. 2021) ....................................................... 12

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ................................................................. 12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................. 7

*Chamber of Com. of U.S. v. EPA*,
   642 F.3d 192 (D.C. Cir. 2011) ............................................................ 8, 29

*Citizens for Resp. & Ethics in Wash. v. Off. of Special Couns.*,
   2020 WL 4530647 (D.D.C. Aug. 6, 2020) ............................................. 20

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................. 9

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*
   No. 1:18-cv-295 (W.D. Tex. Nov. 6, 2018) ............................................. 4

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. FDIC.*,
   2016 WL 7376847 (D.D.C. Dec. 19, 2016) ........................................... 13

*Ctr. for Biological Diversity v. Bernhardt*,
   442 F. Supp. 3d 97 (D.D.C. 2020) ........................................................ 20

*\*Ctr. for Biological Diversity v. Bernhardt*,
   2020 WL 5702087 (D.D.C. Sept. 24, 2020) ................................... *passim*

*Ctr. for Democracy & Tech. v. Trump,*
  2020 WL 7318008 (D.D.C. Dec. 11, 2020) ............................................ 20, 23

*Ctr. for L. & Educ. v. Dep't of Educ.,*
  396 F.3d 1152 (D.C. Cir. 2005) ............................................................ 13

*Ctr. for Responsible Sci. v. Gottlieb,*
  346 F. Supp. 3d 29 (D.D.C. 2018) ...................................................... 17, 31

*\*Ctr. for Responsible Sci. v. Hahn,*
  809 F. App'x 10 (D.C. Cir. 2020) ....................................................... *passim*

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ............................................................................ 8

*Elec. Priv. Info. Ctr. v. FAA,*
  892 F.3d 1249 (D.C. Cir. 2018) ........................................................... 18

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
  878 F.3d 371 (D.C. Cir. 2017) ........................................................... 2, 8

*\*Env't Working Grp. v. FDA,*
  301 F. Supp. 3d 165 (D.D.C. 2018) .................................................... *passim*

*Equal Rts. Ctr. v. Post Props., Inc.,*
  633 F.3d 1136 (D.C. Cir. 2011) ................................................ 1, 7, 14, 26, 30

*Fla. Audubon Soc. v. Bentsen,*
  94 F.3d 658 (D.C. Cir. 1996) ............................................................. 12

*\*Food & Water Watch, Inc. v. Vilsack,*
  808 F.3d 905 (D.C. Cir. 2015) .......................................................... *passim*

*Freedom Watch, Inc. v. McAleenan,*
  442 F. Supp. 3d 180 (D.D.C. 2020) .................................................... 20

*Grand Lodge of the Fraternal Ord. of Police v. Ashcroft,*
  185 F. Supp. 2d 9 (D.D.C. 2001) ..................................................... 6, 7, 13

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) .......................................................................... 14

*Int'l Acad. of Oral Med. & Toxicology v. FDA,*
  195 F. Supp. 3d 243 (D.D.C. 2016) ................................................ 18, 23, 24

*Islamic Am. Relief Agency v. Gonzales*,
   477 F.3d 728 (D.C. Cir. 2007) ........................................................................ 7

*Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*,
   402 F.3d 1249 (D.C. Cir. 2005) ..................................................................... 7

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) ....................................................................................... 6

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................ 9, 13, 18

*Nat'l Ass'n of Home Builders v. EPA*,
   667 F.3d 6 (D.C. Cir. 2011) ................................................................... 26, 32

*\*Nat'l Taxpayers Union, Inc. v. United States*,
   68 F.3d 1428 (D.C. Cir. 1995) ................................................................ *passim*

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
   366 F.3d 930 (D.C. Cir. 2004) ................................................................ 12, 13

*New England Anti-Vivisection Soc'y v. United States Fish & Wildlife Serv.*,
   208 F. Supp. 3d 142 (D.D.C. 2016) ............................................................ 18

*PETA v. U.S. Dep't of Agric.*,
   797 F.3d 1087 (D.C. Cir. 2015) ............................................................. *passim*

*Physicians' Educ. Network, Inc. v. Dep't of Health, Educ. & Welfare*,
   653 F.2d 621 (D.C. Cir. 1981) .................................................................... 13

*Pub. Citizen Health Rsch. Grp. v. Pizzella*,
   2021 WL 86861 (D.D.C. Jan. 11, 2021) .................................................. 27, 28

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
   489 F.3d 1279 (D.C. Cir. 2007) ......................................................... 11, 14, 27

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir. 2002) .................................................................. 1, 8

*Sierra Club v. EPA*,
   754 F.3d 995 (D.C. Cir. 2014) ............................................................... 18, 29

*Simon v. E. Ky. Welfare Rts. Org.*,
   426 U.S. 26 (1976) .................................................................................. 12, 13

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ............................................................................................ 7

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ........................................................................................... 8, 29

*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) .................................................................... 11, 12, 15

*United States v. Facebook, Inc.*,
  456 F. Supp. 3d 105 (D.D.C. 2020) ...................................................................... 20

*United Transp. Union v. ICC*,
  891 F.2d 908 (D.C. Cir. 1989) .............................................................................. 11

*Warth v. Seldin*,
  422 U.S. 490 (1975) ................................................................................................ 7

*Weingarten v. Devos*,
  468 F. Supp. 3d 322 (D.D.C. 2020) ............................................................ 15, 17, 26, 31

*West v. Lynch*,
  845 F.3d 1228 (D.C. Cir. 2017) .............................................................................. 8

**Statutes**

12 U.S.C. § 5481(5) ..................................................................................................... 3

12 U.S.C. § 5481(15)(A)(i) ........................................................................................... 3

12 U.S.C. § 5491 .......................................................................................................... 3

12 U.S.C. § 5511 .......................................................................................................... 3

12 U.S.C. § 5512(b) ..................................................................................................... 3

12 U.S.C. § 5531(b) ..................................................................................................... 3

12 U.S.C. § 5536(a)(1)(B) ........................................................................................... 3

*Dodd-Frank Wall Street Reform and Consumer Protection Act*,
  Pub. L. No. 111-203, 124 Stat. 1376 (2010) ........................................................... 3

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................................... 6

**Regulations**

12 C.F.R. § 1041.7 ............................................................................................................ 4

12 C.F.R. § 1041.8(b)(1) ................................................................................................... 4

**Other Authorities**

5A Charles A. Wright & Arthur R. Miller,
  Fed. Prac. & Proc. 2D, § 1350 ................................................................................ 6, 7, 13

*Payday, Vehicle Title, and Certain High-Cost Installment Loans,*
  82 Fed. Reg. 54472 (Nov. 17, 2017) ........................................................................ 3, 4

*Payday, Vehicle Title, and Certain High-Cost Installment Loans,*
  84 Fed. Reg. 4252 (Feb. 14, 2019) .............................................................................. 4

*Payday, Vehicle Title, and Certain High-Cost Installment Loans; Delay of Compliance Date;*
  *Correcting Amendments,*
  84 Fed. Reg. 27907 (June 17, 2019) ............................................................................ 4

*Payday, Vehicle Title, and Certain High-Cost Installment Loans,*
  85 Fed. Reg. 44382 (July 22, 2020) ...................................................................... 4, 5, 18

## INTRODUCTION

The National Association for Latino Community Asset Builders (NALCAB), a nonprofit membership association of community organizations that serve Latino communities, seeks to challenge a recent Consumer Financial Protection Bureau (CFPB or Bureau) rule. But the rule does not directly regulate NALCAB or any of its member organizations, and NALCAB fails to plausibly allege that it, or any of its member organizations, has standing to bring this challenge.[1]

An organization seeking to establish its standing can proceed under a theory of "organizational standing" by asserting standing "on its own behalf." *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). Or it can proceed under a theory of "associational standing" by asserting standing "on behalf of its members," *id.*, and demonstrating that one of its members "would have standing to sue in [its] own right," *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002). NALCAB's operative complaint does not plausibly allege standing under either theory.

To begin, NALCAB's suggestion that either it or any of its members will be injured by the rule is mere conjecture. Neither NALCAB nor any of its members are directly subject to the rule at issue. Absent any direct injury, NALCAB is left to allege that the rule will trigger a cascade of events that will ultimately culminate in a strain on its resources or the resources of one of its members. Yet, NALCAB does not provide any specific facts or detailed allegations in support of its speculation. And NALCAB's predictions as to how the future will unfold all turn on assumptions about the conduct of independent third parties, namely lenders and consumers, who

---

[1] The Court's Jan. 26, 2021 Minute Order granted the Bureau's motion to waive compliance with Local Civil Rule 7(n) and noted that if the Court denies the Bureau's motion to dismiss, it will then direct the parties to propose a schedule, including for the filing of the administrative record. At the Feb. 3 status conference, the Court confirmed the applicability of this ruling after Plaintiff amended its complaint.

are not parties to this litigation.   NALCAB's speculation prevents it from showing injury, causation, or redressability and is thus "fatal to standing." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017).

Even if NALCAB's purported future injuries were to come to fruition, they are not the sort of concrete and demonstrable injuries that are cognizable under Article III.   NALCAB fails to plead that either it or any of its member organizations have suffered an injury in fact attributable to the challenged rule.   It does not plausibly allege that the challenged rule will "perceptibly impair [NALCAB]'s ability to provide services." *Ctr. for Biological Diversity v. Bernhardt*, No. 19-cv-02898-APM, 2020 WL 5702087, at *4 (D.D.C. Sept. 24, 2020) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015)).   Nor does it credibly claim that the challenged rule will subject NALCAB "to operational costs beyond those normally expended." *Id.* (quoting *Food & Water Watch*, 808 F.3d at 920).   So too with the sole member organization that NALCAB mentions in its Amended Complaint.   The Amended Complaint makes clear that whether or not the challenged rule is in effect, both NALCAB and its member organization will continue to conduct the same sort of activities (financial coaching and public education related to consumer finance) that they have always conducted.   And they will expend the same resources doing so.

Accordingly, NALCAB has failed to demonstrate its standing to bring this lawsuit.   The harms it alleges—based on a chain of assumptions about others' future conduct—are too speculative to constitute cognizable injury that is fairly traceable to the challenged conduct and redressable by an order of this Court.   And even if the Court were to agree that the harms NALCAB alleges are likely to imminently occur, they are not the sort of harms that can give rise to a cognizable injury for purposes of Article III.   The Bureau, thus, respectfully requests that the Court

dismiss this action for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

## BACKGROUND

### A.     The Consumer Financial Protection Act

In response to the 2008 financial crisis, Congress enacted the Consumer Financial Protection Act of 2010 (CFPA or Act) as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376. The CFPA created the Consumer Financial Protection Bureau and charged the new agency with implementing and enforcing federal consumer financial laws. *See* 12 U.S.C. §§ 5491, 5511. The CFPA grants the Bureau a host of rulemaking, enforcement, and other authorities. As most relevant here, the CFPA empowers the Bureau to write rules implementing federal consumer financial law, including rules to "identify[]" and "prevent[]" "unfair, deceptive, or abusive" acts and practices in connection with consumer loans or other consumer financial products and services. 12 U.S.C. § 5531(b); *see also id*. §§ 5512(b), 5481(5), 5481(15)(A)(i), 5536(a)(1)(B).

### B.     The 2017 Payday Rule

Pursuant to its authorities under the CFPA, the Bureau published a rule entitled "Payday, Vehicle Title, and Certain High-Cost Installment Loans" in the Federal Register on November 17, 2017. 82 Fed. Reg. 54472. As initially promulgated, the 2017 Rule imposed two main sets of requirements on lenders making covered loans. The Rule's first set of requirements, the "Mandatory Underwriting Provisions," which were contained primarily in subpart B, identified it as an "unfair" and "abusive" practice for lenders to make a covered loan without first reasonably determining that the consumer would be able to repay it according to its terms. *Id.* at 54874. The Mandatory Underwriting Provisions accordingly prohibited that practice and prescribed specific

steps that lenders had to take to assess consumers' ability to repay (unless they made the loan in accordance with an exemption). *Id.* at 54874–77.

The Rule's second set of requirements, the "Payment Provisions" that are contained primarily in subpart C, regulate covered lenders' payment-withdrawal practices. Among other things, the Payment Provisions prohibit lenders from attempting to withdraw payment from a covered loan from a borrower's account after two consecutive attempts have failed due to lack of sufficient funds, unless the borrower specifically provides new authorization to do so. 12 C.F.R. § 1041.8(b)(1). This prohibition is based on the Bureau's finding that it is "unfair" and "abusive" to make such repeated withdrawal attempts without the consumer's renewed authorization. *See id.* § 1041.7; 82 Fed. Reg. at 54731.

The 2017 Rule established August 19, 2019, as the compliance date for both the Mandatory Underwriting Provisions and the Payment Provisions. *Id.* at 54472. On June 17, 2019, the Bureau delayed the compliance date of the 2017 Rule's Mandatory Underwriting Provisions by fifteen months to November 19, 2020.[2] 84 Fed. Reg. 27907.

### C.   The 2020 Revocation Rule

The Bureau issued a notice of proposed rulemaking in February 2019 that proposed to rescind the Mandatory Underwriting Provisions of the 2017 Rule. 84 Fed. Reg. 4252 (Feb. 14, 2019). After considering the comments, the Bureau finalized a rule revoking the Mandatory Underwriting Provisions on July 7, 2020 ("2020 Rule" or "2020 Revocation Rule"). 85 Fed. Reg. 44382 (July 22, 2020).

---

[2] The Bureau delayed the compliance date because it was in the process of reconsidering the 2017 Rule's Mandatory Underwriting Provisions. 84 Fed. Reg. 27907. The compliance date for the Payment Provisions has been stayed by the order of another federal court. *See* Order (ECF No. 53), *Community Financial Services Association of America, Ltd. v. CFPB*, No. 1:18-cv-295 (W.D. Tex. Nov. 6, 2018).

The 2020 Revocation Rule revoked the 2017 Rule's determination that it is an unfair and abusive practice to make certain payday, vehicle title, or certain other short-term loans without first "reasonably determining that consumers have the ability to repay those loans according to their terms." 85 Fed. Reg. 44382, 44382. The 2020 Revocation Rule withdrew the "determination that consumers cannot reasonably avoid any substantial injury caused or likely to be caused by the failure to consider a borrower's ability to repay." *Id.* It also withdrew the Bureau's determination that "consumers do not have the ability to protect their interests in selecting or using covered loans," and determines that "a lender's not considering a borrower's ability to repay does not take unreasonable advantage of particular consumer vulnerabilities." *Id.* at 44383.

The repeal of the Mandatory Underwriting Provisions went into effect on October 20, 2020.

### D.      The Instant Litigation

On October 29, 2020, NALCAB filed this lawsuit challenging the 2020 Revocation Rule. Compl., Dkt 1. Subsequently, the Court granted the Consumer Financial Services Association of America leave to intervene as a defendant. *See* January 18, 2021 Min. Order. Then, on January 29, 2021, NALCAB filed its Amended Complaint.[3] Dkt. 26.

NALCAB describes itself as "a nonprofit, membership association of mission-driven community and economic development organizations." *Id.* ¶ 6. It provides "training, technical assistance and grants" to its member organizations with the goal of "advancing economic mobility in low- and moderate- income communities." *Id.* NALCAB avers that it helps its member organizations "create and strengthen financial capability programs," which in turn, "help

---

[3] On January 8, 2021, the Bureau moved to dismiss NALCAB's original complaint. Dkt. 15. The Bureau's motion to dismiss was rendered moot when NALCAB filed its Amended Complaint. *See* February 3, 2021 Min. Order (denying the Bureau's motion to dismiss as moot and ordering Defendants to answer or otherwise respond to Defendants' Amended Complaint by March 1, 2021); *see also* Dkt. 31 (extending Defendants' deadline to answer or otherwise respond to March 22, 2021).

consumers … build their credit history, increase their savings, and reduce their debt." *Id.* In its Amended Complaint, NALCAB provides a description of one of its member organizations, the Mission Economic Development Agency (MEDA). *Id.* ¶ 9. NALCAB describes MEDA as a nonprofit organization which "runs a financial capability program," that "provides one-on-one financial coaching" to its clients. *Id.*

NALCAB alleges that the 2020 Revocation Rule, for a variety of reasons, "is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* ¶ 3. It also alleges that the 2020 Revocation Rule was "promulgated without observance of rulemaking requirements." *Id.* NALCAB thus asks the Court to declare the 2020 Revocation Rule unlawful, enjoin the Bureau from implementing the 2020 Revocation Rule, and order the Bureau to promptly implement the 2017 Rule, including its Mandatory Underwriting Provisions.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) permits a defendant to move to dismiss a claim for "lack of subject-matter jurisdiction." Subject-matter jurisdiction "focuses on the court's power to hear the plaintiff's claim," thus "a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of the Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (citing 5A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. 2d, § 1350). Under Rule 12(b)(1), "the plaintiff bears the burden of establishing that the court has jurisdiction." *Id.* "Federal courts are courts of limited jurisdiction … It is to be presumed that a cause lies outside of this limited jurisdiction and the burden establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted).

To establish the Court's subject-matter jurisdiction and avoid dismissal under Rule 12(b)(1), "a plaintiff must satisfy the traditional elements of Article III standing (1) 'an injury-in-

fact,' (2) 'that is fairly traceable to the challenged conduct of the defendant,' and (3) 'that is likely to be redressed by a favorable judicial decision." *Ctr. for Biological Diversity*, 2020 WL 5702087, at *3 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). "On a motion to dismiss for lack of standing, the Court must accept all well-pleaded factual allegations in the complaint as true." *Id.* (citing *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005)). However, "the plaintiff must 'clearly … allege facts demonstrating' each element" of standing. *Spokeo*, 136 S. Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). The Court need not "accept inferences that are unsupported by the facts set out in the complaint." *Id.* (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)). And "[t]hreadbare recitals of the elements [of standing], supported by mere conclusory statements, do not suffice." *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Moreover, because a Rule 12(b)(1) motion implicates jurisdiction and the very authority of the court to hear the case, the plaintiff's factual allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge*, 185 F. Supp. 2d at 13-14 (D.D.C. 2001) (quoting 5A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. 2d, § 1350). "If a complaint does not contain sufficient factual matter 'to state a claim [of standing] that is plausible on its face,' it must be dismissed." *Ctr. for Biological Diversity*, 2020 WL 5702087, at *3 (alteration in original) (quoting *Iqbal*, 556 U.S. at 678).

## ARGUMENT

NALCAB has failed to allege facts sufficient to demonstrate its standing. As an organization, it could have done so through either of two avenues. First, under a theory of "organizational standing," it could have demonstrated standing "on its own behalf." *Equal Rts. Ctr.*, 633 F.3d at 1138. Second, under a theory of "associational standing," it is permitted to assert

standing "on behalf of its members." *Id.* Under the latter theory, NALCAB was required to demonstrate one of its members "would have standing to sue in [its] own right." *Sierra Club*, 292 F.3d at 898. In this respect, "it is not enough to aver that unidentified members" may have standing. *Chamber of Commerce of the U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011). Rather, NALCAB "must specifically identify" the members of its organization on which its claim to associational standing is predicated. *Id.* (internal quotation mark omitted) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).

NALCAB's Amended Complaint only references one of its members, MEDA, which, like NALCAB, is a nonprofit organization. Am. Compl. ¶ 9. Thus, to meet its burden to establish subject-matter jurisdiction, NALCAB must show (at minimum) that either it or MEDA has satisfied the three elements of standing: (1) injury in fact, (2) causality, and (3) redressability. *See Food & Water Watch,* 808 F.3d at 919.

NALCAB has not met this burden. First, any future harm to NALCAB or MEDA is purely speculative, and, for that reason, NALCAB is unable to show injury, causation, or redressability. Second, even if the repeal of the Mandatory Underwriting Provision does cause the harms to these organizations that NALCAB has alleged, those harms are too abstract to be cognizable under Article III.

## I.    NALCAB's Allegations Regarding Its Standing Are Speculative.

"Speculation is ordinarily fatal to standing." *Presidential Advisory Comm'n*, 878 F.3d at 379. This is because speculation defeats all three prongs of the standing inquiry. *Id.* As the D.C. Circuit has explained, a plaintiff that speculates as to how it will be injured by the challenged conduct not only "cannot establish injury" but also "cannot establish causation or redressability." *Id.* (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006) and *West v. Lynch*, 845 F.3d 1228, 1236–37 (D.C. Cir. 2017)). Rather, to establish standing, a plaintiff must proffer "specific

facts" showing that it suffered an injury (or imminently will suffer an injury) "demonstrably attributable" to the challenged conduct. *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). NALCAB has failed to do so here.

Instead, NALCAB offers only a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). NALCAB posits that "no-underwriting lending" leaves many consumers "with loans they cannot afford to repay." Am. Compl. ¶ 7. As a result, NALCAB alleges that repeal of the Mandatory Underwriting Provisions will leave many families "deeper in debt" and unable to "increase their savings" or "achieve financial stability." *Id.* More families in debt, in turn, means that more families will need to utilize the services of the "community and economic development organizations." *Id.* at ¶ 6. That means, according to NALCAB, that these organizations will "need more assistance from NALCAB." *Id.* ¶ 7. And as a result, NALCAB will have to "continue expending resources" which it would not have to expend if the Payday Lending Rule's restrictions on no-underwriting went into effect. *Id.* Similarly, as concerns MEDA, the only of its member organizations that NALCAB identifies in its Amended Complaint, NALCAB alleges that without the Mandatory Underwriting Provisions, "MEDA will have more clients in need of additional help." *Id.* at ¶ 9. Consequently, NALCAB alleges that MEDA will be required to "spend coaching resources on providing additional per-client assistance to these individuals." *Id.* And, because of the increased demand for its financial coaching services, MEDA will have no choice but to divert resources "from other clients or activities." *Id.*

In short, NALCAB alleges that the repeal of the Mandatory Underwriting Provisions will set off a chain of events affecting lenders first and then consumers and then community organizations, ultimately culminating in an indirect future injury to NALCAB. This narrative is overly attenuated and speculative. NALCAB engages in pure conjecture as to (1) how an alleged

future worsening of families' financial circumstances will affect the demand for financial coaching and other community financial services, (2) how a hypothesized increase in demand for financial coaching and community financial services will affect the operations and expenditures of its member organizations, such as MEDA, (3) how a hypothesized strain on the operations and expenditures of its member organizations, such as MEDA, will affect the need for assistance from umbrella organizations like NALCAB, and (4) how a hypothesized increase in demand for assistance from NALCAB will affect NALCAB's own operations and expenditures. NALCAB's basis for standing is, at best, speculation.

NALCAB's allegations fail entirely to account for other eventualities, contingencies, and intervening events that could lead to different results. And, the Amended Complaint fails to consider whether repeal of the Mandatory Underwriting Provisions may have effects different from NALCAB's guesses or that some of the effects NALCAB predicts may result from other causes. For example, it is pure speculation that any consumer that takes out a loan prohibited by the 2017 Rule will turn to NALCAB or one of its member organizations for assistance, as opposed to some other organization, or no organization all. It is, similarly, pure speculation that NALCAB's member organizations will respond to an increase in demand for financial coaching by turning to NALCAB for support rather than through fundraising or the diversion of other revenue streams. Moreover, the Amended Complaint critically does not account for the myriad other factors that might affect the macroeconomy and in turn families' financial wellbeing and need for financial assistance. It is possible, if not likely, that fluctuations in the job market or external events, such as the pandemic, will be more determinative of the demand for financial coaching and assistance than the CFPB's decision to repeal the Mandatory Underwriting Provisions.

Given these uncertainties, NALCAB's conjecture and speculation are insufficient for standing. To begin, NALCAB is not entitled to engage in "guesswork" about the future. *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 25 (D.C. Cir. 2015). While NALCAB may project that the repeal of the Mandatory Underwriting Provision will set off a future cascade of negative consequences ultimately culminating in injury to it or one of its members, its "'predictions of future events …' are too speculative to support a claim of standing." *Id.* (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 912 (D.C. Cir. 1989)). The D.C. Circuit has made clear that an organizational plaintiff is not entitled to standing based on "remote and speculative claims of possible future harm its members." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1294 (D.C. Cir. 2007). And, allowing a plaintiff offering only conjecture as to how the future may (or may not) unfold "to obtain federal court jurisdiction threatens … to eviscerate the Supreme Court's standing doctrine." *Id.*

Relatedly, NALCAB is not entitled to engage in guesswork regarding "the future actions taken by third parties." *Turlock*, 786 F.3d at 25 (quoting *United Transp. Union*, 891 at 912). Here, NALCAB does not allege either it or any of its members is directly affected by the repeal of the Mandatory Underwriting Provisions. Rather, NALCAB speculates as to how independent third parties—namely lenders, consumers, and community organizations—will respond to the repeal of the Mandatory Underwriting Provisions and, in turn, speculates about how NALCAB itself will be affected by the behavior of these third parties.[4] Yet, the D.C. Circuit has "repeatedly held that

---

[4] The Amended Complaint itself acknowledges that the ultimate consequences of the repeal of the Mandatory Underwriting Provision are highly uncertain, in part because the behavior of third parties cannot be predicted with certitude. For instance, the Amended Complaint asserts that the Bureau's belief that the Mandatory Underwriting Provisions would significantly reduce the volume of payday loans issued was an "overestimate" because "lenders would likely adjust their product terms to be able to continue more lending under the new rule" and lenders might "for example, offer smaller loans that are affordable or offer installment (rather than balloon)

litigants cannot establish an Article III injury based on the independent actions of some third party not before this court." *Am. Lung Ass'n v. EPA*, 985 F.3d 914, 990 (D.C. Cir. 2021) (quoting *Turlock*, 786 F.3d at 25 (quoting *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) (en banc))). "In other words, mere 'unadorned speculation' as to the existence of a relationship between the challenged government action and third-party conduct 'will not suffice to invoke the federal judicial power.'" *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976)).

Finally, NALCAB's speculation is entirely conclusory. NALCAB does not allege any concrete facts or detailed allegations to support the causal connections it posits between the repeal of the Mandatory Underwriting Provisions and its purported future injury. For instance, NALCAB does not even attempt to allege that its services and expenditures (or MEDA's services and expenditures) differ between states that do and do not allow payday lending. Similarly, NALCAB does not offer any information about how its services and expenditures (or MEDA's services and expenditures) have been affected by other similar regulations (i.e., state payday lending regulations). Having chosen not to bolster its narrative with any supporting detail that might render it plausible, the Court is left with NALCAB's unsubstantiated hypotheses and speculative projections about the future. This is not enough.

In considering its Article III jurisdiction, the Court is not required to "accept inferences that are unsupported by facts set out in the Complaint." *Food & Water Watch*, 808 F.3d at 913 (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)). In fact, given that the Court's

---

payments." Am. Compl. ¶ 30. The cascade of negative effects that ultimately leads to NALCAB's alleged injury is predicated on even more uncertain assumptions about third-party behavior, including not just the behavior of the regulated lenders, but also their customers, and ultimately those organizations that may provide services to those customers.

jurisdiction is at issue, NALCAB's allegations "bear closer scrutiny" than under an ordinary motion to dismiss for failure to state a claim. *Grand Lodge*, 185 F. Supp. 2d at 13–14 (quoting 5A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. 2D, § 1350). Thus, to show standing, even on a motion to dismiss, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Nat'l Wrestling Coaches Ass'n*, 366 F.3d 930 (quoting *Lujan*, 504 U.S. at 562). For that reason, NALCAB must allege some evidence supporting a causal link between the repeal of the Mandatory Underwriting Provisions and its purported future injury. "Absent any tangible evidence, it is 'mere unadorned speculation'" to infer that the repeal of these provisions will result in any of the consequences NALCAB predicts. *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. FDIC*, No. 14-cv-953-GK, 2016 WL 7376847, at *10 (D.D.C. Dec. 19, 2016) (quoting *National Wrestling Coaches Ass'n*, 366 F.3d at 838).

In sum, "[h]aving outlined the alleged causal chain … the connection between the beginning and the end of the purported chain remains so attenuated that we cannot hold the alleged injury to be 'fairly traceable to' the [regulation at issue]." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160–61 (D.C. Cir. 2005). NALCAB's purported future injuries, the purported future injuries of its members, and the purported causal link between those injuries are supported by nothing more than "[u]nadorned speculation," which "will not suffice to invoke the judicial power." *Physicians' Educ. Network, Inc. v. Dep't of Health, Educ. & Welfare*, 653 F.2d 621, 627 (D.C. Cir. 1981) (quoting *Simon*, 426 U.S. at 44). The Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for that reason alone.

## II.    NALCAB Has Failed to Allege That It or Any of Its Members Have Suffered a Cognizable Injury in Fact.

Yet, even if NALCAB's speculation about its potential injury was not fatal to its standing, it would still lack standing and dismissal would be proper because the injury it alleges is not cognizable for purposes of Article III.   NALCAB has not adequately alleged that it or any of its members have suffered the type of injury in fact that is sufficient to confer standing.   An injury in fact must be "concrete," "particularized," and "actual or imminent."   *Food & Water Watch*, 808 F.3d at 914 (quoting *Pub. Citizen*, 489 F.3d at 1292).   The Supreme Court has held that, to show an injury in fact, an organizational plaintiff must allege "more than simply a setback" to its "abstract social interests."   *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also PETA v. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (quoting *Equal Rts. Ctr.*, 633 F.3d at 1138) ("[U]nder our precedent, 'a mere setback to [the organizational plaintiff]'s abstract social interests is not sufficient.").   Consistent with this principle, "[a]n organization must allege more than a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'"   *Food & Water Watch*, 808 F.3d at 919 (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)).

### A.    NALCAB Has Failed to Plausibly Allege That It Has Suffered a Cognizable Injury as a Result of the Repeal of the Mandatory Underwriting Provisions.

To determine whether an organization has alleged a cognizable injury—rather than a mere abstract frustration of its organizational purpose—the D.C. Circuit applies a two-part test.   First, the challenged conduct must have "injured the organization's interests," and, second, the organization must have "used its resources to counteract that harm."   *PETA*, 797 F.3d at 1094 (quoting *Equal Rts. Ctr.*, 633 F.3d at 1140); *accord Ctr. for Biological Diversity*, 2020 WL 5702087, at *4 (applying the same two-part inquiry).   NALCAB has failed to make either showing.

1. <u>NALCAB has failed to plausibly allege an injury to its own organizational interests.</u>

"The central question … in an organization standing case … is whether the plaintiff 'has suffered a concrete and demonstrable injury to its activities.'" *Env't Working Grp. v. FDA*, 301 F. Supp. 3d 165, 170–71 (D.D.C. 2018) (quoting *PETA*, 797 F.3d at 1093). To show injury, a plaintiff must allege that, as a result of the law or conduct it seeks to challenge, its "activities have been impeded." *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006); *see also Weingarten v. Devos*, 468 F. Supp. 3d 322, 333 (D.D.C. 2020) (quoting *Food & Water Watch*, 808 F.3d at 919) ("The D.C. Circuit 'has distinguished between organizations that allege that their activities have been impeded'—which might have suffered an injury-in-fact and 'those that merely allege that their mission has been compromised'—which have not.").

To determine whether an organization has suffered a concrete and demonstrable injury to its activities, the D.C. Circuit asks whether "the defendant's conduct perceptibly impaired the organization's ability to provide services." *Ctr. for Biological Diversity*, 2020 WL 5702087, at *4 (quoting *Turlock*, 786 F.3d at 24). Or, in other words, whether the "the challenged conduct causes an actual 'inhibition of the organization's daily operations.'" *Env't Working Grp.*, 301 F. Supp. 3d at 171 (quoting *Food & Water Watch*, 808 F.3d at 919); *see also Ctr. for Responsible Sci. v. Hahn*, 809 F. App'x 10, 12 (D.C. Cir. 2020) (quoting *Food & Water Watch*, 808 F.3d at 919; *PETA*, 797 F.3d at 1094; and *Am. Anti-Vivisection Soc'y v. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020)) (organizational standing requires a showing of harm to organizations "services," "daily operations," or "activities").

Here, NALACB describes itself as "a nonprofit, membership association of mission-driven community and economic development organizations" that work "to strengthen the economy by

advancing economic mobility in Latino communities." Am. Compl. ¶ 6.  The Amended Complaint describes NALCAB's organizational activities as the provision of "training, technical assistance, and grants" to other nonprofit organizations.  *Id.*  Specifically, NALCAB "helps organizations create and strengthen financial capability programs."  *Id.*  NALCAB alleges that it will be injured as a result of the 2020 Revocation Rule because without the Mandatory Underwriting Provisions in place, more families will use unaffordable payday loans.  *Id.* at ¶ 7.  Since "unaffordable loans sink families deeper in debt," NALCAB alleges organizations that run financial capability programs will "need more assistance from NALCAB[] to be able to help families avoid or address unaffordable payday and title loans."  *Id.*  Even aside from its speculative nature, this allegation—NALCAB's only purported injury—is not enough to establish standing.

Nothing in NALCAB's Amended Complaint so much as suggests that the 2020 Revocation Rule will impede NALCAB's activities or impair its ability to provide services, as is required to satisfy the first prong of the organizational injury test.  To the contrary, NALCAB's allegation is that the repeal of the Mandatory Underwriting Provisions will increase the demand for its services, and it will, therefore, provide *more* services, principally by offering a variety of trainings on how community organizations can "address no-underwriting lending."  *Id.* ¶ 8.  The allegation that some organizations may "need more assistance from NALCAB," *id.* ¶ 7, is not relevant to the question of whether NALCAB suffered an injury to its organizational interests.  That question turns on whether NALCAB has alleged that the 2020 Revocation Rule will "impair[] [its] ability to provide services" and thereby "cause[] an actual 'inhibition of [its] daily operations.'" *Env't Working Grp.*, 301 F. Supp. 3d at 171.  And, NALCAB has alleged no facts at all suggesting that the 2020 Revocation Rule will in anyway impede its ability to provide services or inhibit its operations.

a.       A Diversion of Resources Is Not a Cognizable Injury

NALCAB's purported need to expend resources in response to the 2020 Revocation Rule (to meet the increased demand for its services) is not enough to establish standing. *See* Am. Compl. ¶ 8 (alleging that NALCAB "continue expending resources, which would otherwise be devoted to other work, to address no-underwriting lending"). Even assuming for present purposes that some of NALCAB's member organizations will be affected by the repeal of the Mandatory Underwriting Provisions and that NALCAB will elect to divert some resources to provide additional services to the affected organizations (in fact, these assumptions are merely speculative, *see supra* pp. 8–14), the diversion of resources is not a cognizable injury.

Courts in this circuit have repeatedly explained that the expenditure of resources in response to a challenged regulation—the precise injury that NALCAB alleges here—is insufficient to satisfy the first prong of the organizational injury test:

> [A plaintiff's] allegation that it has had to redirect its resources from other projects … "confuses the two prongs of the injury-in-fact inquiry." A diversion of resources "is certainly relevant to step two"—whether the [plaintiff] used resources to counteract the alleged harm to its activities. But step two is irrelevant unless the organization can show harm to its activities *distinct from* the diversion of resources. "The diversion itself cannot alone constitute the harm" because an organization can divert resources to counteract harm to its activities only after there is such harm to counteract. It "would be hopelessly circular" to hold that the diversion of resources itself—necessary for establishing step two—also inflicts the harm necessary for establishing step one. The current complaint fails to allege that "something about the challenged action itself—rather than the organization's response to it—makes the organization's task more difficult." … This "mere diversion of resources to advance the advocacy mission of an organization is insufficient to confer standing."

*Weingarten*, 468 F. Supp. 3d at 334 (citations omitted) (quoting *Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 41 (D.D.C. 2018), *aff'd sub nom. Ctr. for Responsible Sci. v. Hahn*, 809 F. App'x 10); *see also Ctr. for Responsible Sci.*, 809 F. App'x at 12 (finding no injury to organization's interests despite allegation that challenged conduct "would cost [it] a substantial

sum of money and/or time" to protect clinical trial participants); *Food & Water Watch*, 808 F.3d at 920 (finding no injury to organization's interests even though it alleged that it would be required to "increase the amount of resources that it spends" protecting the public from contaminated poultry); *Ctr. for Biological Diversity*, 2020 WL 5702087, at *5 (finding no injury to organizations' interests despite allegation that challenged conduct would require them "to reallocate significant staff time, expertise, and funds to counteract the harm to their missions").

"It is clear from the Circuit's holdings . . . that having a concrete injury to an organization's interests means that the challenged activity must hamper the organization's ability to do what it does." *New England Anti-Vivisection Soc'y v. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 166 (D.D.C. 2016) (citing *Int'l Acad. of Oral Med. & Toxicology v. FDA*, 195 F. Supp. 3d 243, 259-60 (D.D.C. 2016)).   NALCAB has not alleged that the 2020 Revocation Rule will in any way hamper its ability to do what it does. Absent such an allegation, NALCAB has no injury and no standing.

This is unsurprising given the D.C. Circuit's repeated admonishments that courts must "bear in mind" that if an organization and its members are "not the objects of the challenged regulation, standing 'is ordinarily substantially more difficult to establish.'" *Elec. Privacy Info. Ctr. v. FAA*, 892 F.3d 1249, 1253 (D.C. Cir. 2018) (quoting *Sierra Club v. EPA*, 754 F.3d 995, 999 (D.C. Cir. 2014)).   The Supreme Court has offered similar guidance.   *See Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984) ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish.").   That is the case here: On their face, the Mandatory Underwriting Provisions only regulate "lenders making covered short-term or longer-

term balloon-payment loans," for example, payday lenders.  85 Fed. Reg. at 44382, 44386.  They do not compel any form of compliance from community organizations such as NALCAB.

When an outside organization is not directly subject to the rule it seeks to challenge, like NALCAB here, standing is absent except under narrow circumstances, none of which NALCAB has alleged.  The D.C. Circuit has consistently found the first prong of the organizational injury test to be satisfied only if the plaintiff alleges either that the challenged conduct (1) restricts the plaintiff's access to information or (2) limits its avenues for redress.  *Compare Ctr. for Responsible Sci.*, 809 F. App'x at 12–13 (distinguishing cases where the D.C. Circuit found organizational standing because in "those cases, there were allegations that the plaintiff organizations were denied access to an avenue for redress and denied information that 'perceptibly impaired [the organization's] ability . . . to educate the public'") (quoting *PETA*, 797 F.3d at 1095) *and Food & Water Watch*, 808 F.3d at 921 (finding no standing because the plaintiff did not allege that the challenged conduct "limits its ability to seek redress for a violation of law" nor that it "restricts the flow of information that [it] uses to educate its members") *with Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986) (finding standing because the plaintiff alleged "the same type of injury as the plaintiffs in *Havens Realty*: the challenged regulations deny … the organizations access to information and avenues of redress they wish to use in their routine information-dispensing, counseling and referral activities").

Thus, while a diversion of resources may be relevant to the second prong of the organizational injury test, some form of informational or procedural injury is necessary to satisfy the first prong.  For example, in *PETA v. Department of Agriculture*, 797 F.3d 1087 (D.C. Cir. 2015), the D.C. Circuit held that PETA had standing to challenge the Department of Agriculture (USDA)'s failure to apply the protections of the Animal Welfare Act (AWA) to birds, but it

reached its holding only because: (1) by law, "unless the USDA applied the AWA's protections to birds, PETA could not redress bird mistreatment by filing complaints with the USDA" and (2) "the USDA's failure to protect birds meant, *ipso facto*, that the USDA was not creating bird-related inspection reports that PETA could use to raise public awareness." 797 F.3d 1087, 1095. The Court found PETA had alleged a perceptible impairment to its ability to provide services insofar that it alleged the challenged conduct would deny it "access to bird-related AWA information" and "a means to seek redress for bird abuse." *Id.* at 1095. The fact that "PETA ha[d] expended resources to counter these injuries" was relevant to the Court's analysis but not in and of itself sufficient to show cognizable injury. *Id.* And, courts in this District have consistently denied standing where the organizational plaintiff failed to allege informational or procedural injuries analogous to those alleged in *PETA*. *See, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. Off. of Special Couns.*, No. 19-cv-3757-JEB, 2020 WL 4530647, at *7 (D.D.C. Aug. 6, 2020) (finding no organizational injury and reading *PETA* to require the plaintiff to allege the challenged conduct imposes some limitation on its access to information and its ability to seek redress from harm); *United States v. Facebook, Inc.*, 456 F. Supp. 3d 105, 111 (D.D.C. 2020) (same); *Freedom Watch, Inc. v. McAleenan*, 442 F. Supp. 3d 180, 189 (D.D.C. 2020) (same); *Ctr. for Biological Diversity v. Bernhardt*, 442 F. Supp. 3d 97, 109 (D.D.C. 2020) (same); *Ctr. for Biological Diversity*, 2020 WL 5702087, at *5–6 (same); *Ctr. for Democracy & Tech. v. Trump*, No. 1:20-cv-01456-TNM, 2020 WL 7318008, at *5 (D.D.C. Dec. 11, 2020) (same).

Here, the Amended Complaint alleges simply that repeal of the Mandatory Underwriting Provisions requires NALCAB to provide its member organizations additional assistance. *See* Am. Compl. ¶¶ 7–8. There is no allegation that the 2020 Revocation Rule will restrict NALCAB's

access to information, limit its avenues of redress, or otherwise perceptibly impair its ability to provide services. Absent such an allegation there is no injury and no standing.

Moreover, even if a discretionary diversion of resources could satisfy the first prong of the organizational injury test, NALCAB's allegation would nonetheless fail to establish an injury to its organizational interests for two additional reasons: neither public education expenditures nor ordinary expenditures are cognizable injuries.

b.   Public Education Expenditures Are Not Cognizable Injuries

An organization's efforts to educate its membership or the public about a challenged law do not constitute injury to the organization's interests enough to satisfy the first prong of the test for organizational standing. The D.C. Circuit has held that a "[plaintiff]'s self-serving observation that it has expended resources to educate its members and others regarding [the challenged law] does not present an injury in fact." *Nat'l Taxpayers Union*, 68 F.3d at 1434. This is because "an organization's use of resources 'to educate its members and others'" does not perceptibly impair the organization's activities. *Env't Working Grp.*, 301 F. Supp. 3d at 172 (quoting *Food & Water Watch*, 808 F.3d at 919)). "If an organization's standing to pursue litigation against the government is premised only on injury flowing from expenditures to educate the public, the suit amounts to no more than an assertion of generalized grievances about the conduct of Government, and organizational standing is lacking." *Id.* at 173 (quoting *Food & Water Watch*, 808 F.3d at 926 (Henderson, J., concurring)).

Here, NALCAB alleges simply that implementation of the 2020 Revocation Rule will require it to continue expending resources on educating its member organizations and their staff about issues related to no-underwriting lending. *See* Am. Compl. ¶ 8. NALCAB's purported injury is that it will be required to "develop[] and provide[] training [for] non-profit organizations'

21

executives and staff on strategies to help families avoid or address the harm of unaffordable payday and title loans." *Id.* In other words, NALCAB claims that repeal of the Mandatory Underwriting Provisions will require it to "expend[] resources to educate its members"—precisely the allegation that the D.C. Circuit has rejected as the basis for organizational injury. *Nat'l Taxpayers Union*, 68 F.3d at 1434. This is true whether the organizational plaintiff's educational efforts are aimed at educating its members or the public about the challenged law, or about the risks posed by the challenged law or the underlying product or service being regulated. *See Ctr. for Responsible Sci.*, 809 F. App'x at 12 (finding no injury to organization's interest despite allegation that it would be required "to educate … potential clinical trial participants nationwide about" the risks posed by clinical trials); *Food & Water Watch*, 808 F.3d at 920 (finding no injury to organization's interests despite allegation that it would be required to "spend time and money on increasing its efforts to educate members of the public" about the risks posed by contaminated food products). Under D.C. Circuit precedent, NALCAB's allegation that repeal of the Mandatory Underwriting Provisions will require it to "spend resources educating its members and the public" about the risks posed by no-underwriting lending is, at most, an "abstract injury . . . that is insufficient to support standing." *Food & Water Watch*, 808 F.3d at 921; *see also Ctr. for Biological Diversity*, 2020 WL 5702087, at *5 (finding no standing despite allegation that plaintiff would be required to spend resources providing alerts and information "to its members" and that "staff time was diverted from other pressing education and outreach tasks").

c.    Ordinary Expenditures Are Not Cognizable Injuries

Further, an organization continuing to do what it already does is not an injury to the organization's interests and is not sufficient to satisfy the first prong of the organizational injury test. The D.C. Circuit has held that an organization "cannot convert its ordinary program costs

into an injury in fact." *Nat'l Taxpayers Union*, 68 F.3d at 1434.  Organizational injury requires more than a mere "continuation of [the organization]'s ordinary educational, advocacy, and training activities." *Int'l Acad. of Oral Med. & Toxicology FDA*, 195 F. Supp. 3d at 259 (quotation omitted).  Rather, to demonstrate an injury to its interests, an organization must show that the challenged regulation required it to deviate in a "meaningful way from its standard programmatic efforts that existed before [the challenged law] was promulgated." *Id.*  Thus, for example, organizations that routinely engage in issue advocacy or public education cannot point to further advocacy or education as the basis for their injury, because "this type of work is exactly what these organizations always do." *Env't Working Grp.*, 301 F. Supp. 3d at 172; *see also Ctr. for Democracy & Tech.*, 2020 WL 7318008, at *4 ("[Plaintiff] cannot assert Article III standing by claiming that the activities that it would otherwise engage in now injure it.").

Here, NALCAB has not alleged any injury beyond such a non-cognizable continuation of its "standard programmatic efforts." *Int'l Acad. of Oral Med.*, 195 F. Supp. 3d at 259.  As noted above, NALCAB's only specific allegation of injury is that the 2020 Revocation Rule will require it to offers trainings to nonprofit organizations pertaining to payday lending.  *See* Am. Compl. ¶ 8. Yet, these activities are entirely consistent with how NALCAB, in its Amended Complaint, describes its standard operations.  NALCAB alleges that it routinely "helps organizations create and strengthen financial capability programs" by providing "training, technical assistance, and grants." *Id.* at ¶ 6.  And, it does, in part, to "help consumers … avoid predatory practices." *Id.* Indeed, NALCAB specifically states that if the 2020 Revocation Rule is vacated and the Mandatory Underwriting Provisions are allowed to go into effect it will simply provide its member organizations "other training" and "other technical assistance." *Id.*

Put differently, educating nonprofit organizations about consumer finance and training nonprofit organizations in financial coaching is what NALCAB does. Per the Amended Complaint, it is what NALCAB will do with the 2020 Revocation Rule in place and it is what NALCAB will do if the 2020 Revocation Rule is not in place. A continuation of NALCAB's "ordinary, educational, advocacy, and training activities" is not enough to confer standing. *Int'l Acad. of Oral Med. & Toxicology*, 195 F. Supp. 3d at 259. While NALCAB may respond to the 2020 Revocation Rule by redoubling its efforts to train its member organizations and helping those organizations identify the risks it believes are associated with no-underwriting lending, these efforts do not confer it with standing because NALCAB was already "squarely focused on warning the public about . . . hazards . . . in consumer [financial] products." *Env't Working Grp.,* 301 F. Supp. 3d at 172–73.

For these reasons, NALCAB has failed to demonstrate any injury to its organizational interests and failed to satisfy the first point of the organizational injury test. Indeed, the D.C. Circuit has repeatedly denied standing when presented with allegations similar to those in NALCAB's Amended Complaint, and a closer look at those cases is instructive.

To begin, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015), is controlling. There, a consumer advocacy organization sued the Department of Agriculture, challenging regulations which it believed "may result in an increase in foodborne illness from contaminated poultry." *Id.* at 909. Just as here, the organizational plaintiff asserted standing on the basis that the challenged regulations would require it "to increase the resources that it spends on educating the general public and its members" about the risks associated with a purportedly underregulated consumer product. *Id.* at 920. The D.C. Circuit held that this increase in expenditures resulting from the decision to educate the public about the risks associated with

contaminated poultry were not a proper basis for standing. *Id.* at 919. The plaintiff (like NALCAB here) failed to satisfy the first prong of the organizational injury test by alleging some perceptible impairment to its organizational activities. *Id.*

The court of appeals in *Food & Water Watch* explained that an organization's decision to expend resources in response to deregulatory action is not a cognizable injury for standing purposes, particularly when the expenditures are devoted to a continuation of the organization's routine efforts to educate its membership and the general public. *See id.* ("[Plaintiff] has alleged nothing more than an abstract injury to its interests that is insufficient to support standing ... Although [Plaintiff] alleges that [it] will spend resources educating its members and the public about [the regulation], nothing in [the record] indicates that [the plaintiff] ha[s] been perceptibly impaired in any way."). *Id.* at 921. Because NALCAB has similarly not alleged any impairment to its activities or inhibition of its operations it too "has not alleged an injury in interest to give rise to organizational standing." *Id.*

The D.C. Circuit's recent holding in *Center for Responsible Science v. Hahn*, 809 F. App'x 10 (D.C. Cir. 2020), is also on point. There, the Center for Responsible Science challenged FDA regulations governing what disclosures must be made to participants in clinical trials. The plaintiff alleged an injury on the basis that the FDA's failure to require certain disclosures "would cost [it] a substantial sum of money and/or time to educate and protect the welfare of potential clinical trial participants." *Id.* at 12. The plaintiff attempted to distinguish *Food & Water Watch* by arguing it was required to remediate the consequences of the agency's failure to act by "engaging in direct outreach" to protect clinical trial participants. Yet, the court held that even to the extent the plaintiff "step[ed] into the breach and d[id] what the agency should have done," it still had shown no injury because it failed to identify any harm to its "services," "daily operations," or "activities."

*Id.* Just so here. NALCAB, like the Center for Responsible Science, may believe that it is compelled to protect the public from what it perceives as regulatory inaction through public education or similar endeavors. But NALCAB's allegations fail to demonstrate an injury to its interests for the same reason the Center for Responsible Science's allegations failed: "nothing in [NALCAB's complaint] indicates that [NALCAB's] organizational activities have been perceptibly impaired in any way." *Id.* at 13.

> 2.   NALCAB has failed to plausibly allege that repeal of the Mandatory Underwriting Provisions has required it to use any resources to counteract any alleged harm.

Because NALCAB has failed to allege any plausible injury to its organizational interests and thus failed to satisfy the first prong of the organizational injury test, the Court need not address the second prong of the test. *See Ctr. for Responsible Sci.*, 809 F. App'x at 13 ("Because we conclude [plaintiff]'s amended complaint fails to show how its activities were impaired by the [challenged conduct], we need not address the second prong, which asks whether [plaintiff] sufficiently pled that it used or diverted resources to counteract that harm."); *Weingarten,* 468 F. Supp. 3d at 334 ("The Court does not proceed to the second step—whether the organization used its resources to counteract the agency's action—unless the organization satisfies the first step."). Yet, even if NALCAB had successfully alleged some injury to its organizational interests, it has failed to allege that it has "used its resources to counteract that harm," and therefore failed to satisfy the second prong of the test. *PETA*, 797 F.3d at 1094 (quoting *Equal Rts. Ctr.*, 633 F.3d at 1140).

To satisfy the second prong of the organizational injury test, it is well established that the plaintiff must allege that the challenged conduct "imposed 'operational costs *beyond those normally expended.*'" *Env't Working Grp.*, 301 F. Supp. 3d. at 171–72 (quoting *Food & Water Watch*, 808 F.3d at 920) (emphasis in original); *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434) (explaining that an

organization's expenditures do not constitute injury unless they were for operational costs "beyond those normally expended"); *Ctr. for Biological Diversity*, 2020 WL 5702087, at *4 (quoting *Food & Water Watch*, 808 F.3d at 920) (same).

NALCAB fails to satisfy the second prong of the test, because it never alleges that repeal of the Mandatory Underwriting Provisions will require it to increase its operational expenditures. To the contrary, NALCAB plainly states that it "has already expended resources to address the harm caused by no-underwriting lending practices," and the repeal of the Mandatory Underwriting Provisions will lead NALCAB to "continue expending resources … to address no-underwriting lending." Am. Compl. ¶ 8. Because compliance with the Mandatory Underwriting Provisions of CFPB's 2017 Payday Lending Rule was never required, the consequence of the 2020 Revocation Rule, which repeals those provisions, is simply to perpetuate the status quo. Put differently, because compliance with the Mandatory Underwriting Provisions was never required, repealing them does not impose any new burden on NALCAB. Following the repeal of the Mandatory Underwriting Provisions, NALCAB found itself in precisely the same situation it was in prior to the repeal of those provisions. And where the result of a challenged law or regulation is that an organization merely continues do what it has always done, there is no injury. *Env't Working Grp.*, 301 F. Supp. 3d at 172; *see also Pub. Citizen Health Rsch. Grp. v. Pizzella*, No. 19-cv-166-TJK, 2021 WL 86861, at *6 (D.D.C. Jan. 11, 2021) (finding no injury where plaintiffs argued that they were "deprived of an *anticipated* benefit" from a regulation that was never implemented and ultimately rescinded because the rescinded regulation "never played a role in the [plaintiff]'s ability to provide services or their daily operations").

NALCAB fares no better comparing its current expenditures (with the Mandatory Underwriting Provisions having been repealed) against a hypothetical future where the Mandatory

Underwriting Provisions are fully implemented.  In its Amended Complaint, NALCAB alleges that implementation of the Mandatory Underwriting Provisions would allow it "to reduce the resources it spends on addressing no-underwriting lending and to spend resources on other efforts," namely offering other programming to nonprofit organizations.  Am. Compl. ¶ 8.  Put simply, NALCAB alleges that the 2020 Revocation Rule will cause it to shift resources from one type of training to other similar trainings.  However, as noted *supra*, this sort of diversion of resources without an overall increase in expenditures is not enough for standing.  *See Nat'l Taxpayers Union*, 68 F.3d at 1434 (finding no injury even where the plaintiff diverted resources "to educate its members and others regarding [the challenged law]" because the plaintiff was not "subjected . . . to operational costs beyond those normally expended to review, challenge, and educate the public about … legislation" nor was the plaintiff "forced … to expend resources in a manner that keeps [it] from pursuing its true purpose"); *Env't Working Grp.*, 301 F. Supp. 3d at 172–73 (finding no injury despite the plaintiffs' allegation "that they have diverted resources to focus on this issue").  NALCAB plainly does not allege, as it is required to do under the second prong of the organizational injury test, that the Bureau's promulgation of the 2020 Revocation Rule has required it to spend more money overall than it otherwise would.  Therefore, NALCAB has no injury and no standing.  *See Food & Water Watch*, 808 F.3d at 920 (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434) ("[A]n organization does not suffer an injury in fact . . . unless doing so subjects the organization to 'operational costs beyond those normally expended.'"); *Pizzella*, 2021 WL 86861, at *7 ("But simply maintaining their current operational costs cannot help establish organizational injury.").

**B.**     **NALCAB Has Failed to Plausibly Allege that MEDA Has Suffered a Cognizable Injury as a Result of the Repeal of the Mandatory Underwriting Provisions.**

Perhaps recognizing that its own standing allegations are too attenuated, NALCAB's complaint also attempts to assert standing on behalf of one of the organizations NALCAB services, MEDA. But these allegations fare no better. NALCAB cannot assert associational standing because, as it failed to plausibly plead it suffered an injury in fact from the challenged Bureau regulation, it does not plausibly plead that MEDA (or any of its other members) has suffered an injury in fact sufficient to establish its standing.

To establish associational standing, NALCAB must show that (1) "at least one of [its] members would have standing to sue," (2) "the interests [it] seeks to protect are germane to the organization's purposes," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members." *Sierra Club*, 754 F.3d at 998–99. With regard to the first factor, NALCAB "must specifically identify" the members of its organization which it believes would independently have standing to bring suit. *Chamber of Commerce*, 642 F.3d at 199 (quoting *Summers*, 555 U.S. at 499). Because NALCAB's members are organizations themselves, for any of them to have standing NALCAB must plausibly explain how the relevant organization meets the two-prong organizational standing test described above.

NALCAB's Amended Complaint only references one of its members, MEDA, which, like NALCAB, is a nonprofit organization. Am. Compl. ¶ 9. MEDA lacks organizational standing for the same reasons NALCAB does. First, NALCAB has failed to allege any injury in fact because it does not plausibly plead impairment of MEDA's organizational interests and, second, NALCAB has failed to allege that MEDA has expended resources to counteract any harm resulting from such organizational impairment. Because NALCAB has not shown that any of its members would

independently have standing to sue, it cannot assert associational standing and the Court need not consider the other two factors of the associational standing test.

1.    <u>NALCAB Has Failed to Plausibly Allege an Injury to MEDA's Organizational Interests.</u>

NALCAB does not allege any facts that support an inference that repeal of the Mandatory Underwriting Provisions will impair MEDA's ability to provide services or inhibit its daily operations.  For that reason, NALCAB is unable to demonstrate that MEDA would independently have organizational standing to bring suit.  *See* supra pp. 15–26; *see also Env't Working Grp.*, 301 F. Supp. 3d at 171 ("To satisfy the first prong—'an injury to its interest'—'an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services.' Perceptible impairment occurs when the challenged conduct causes an actual inhibition of the organization's daily operations.") (alternations adopted) (citations omitted) (quoting *Food & Water Watch*, 808 F.3d at 919).

NALCAB describes MEDA as a nonprofit organization that works "to improve the quality of life of low-wage property service workers and their families by increasing their skills, access to education, and opportunities for career and community advancement."  Am. Compl. ¶ 9. According to the Complaint, MEDA "offers free programs that include on-on-one financial coaching for clients."  *Id.*  The Amended Complaint asserts that "[i]f the Payday Lending Rule's restrictions on no-underwriting lending went into effect, fewer MEDA coaching clients would be struggling with unaffordable payday loans," and as a result, "MEDA would be able to reduce the time it spends coaching clients regarding unaffordable payday loans."  *Id.*  This allegation is not enough to establish a "concrete and demonstrable injury to [MEDA's] activities." *Equal Rts. Ctr.*, 633 F.3d at 1138.  In fact, the allegation falls short for similar reasons that NALCAB's allegations pertaining to its own purported injury are deficient.

The Amended Complaint fatally does not allege an impairment of MEDA's services or inhibition of its daily operations sufficient to satisfy the first test for organizational injury. The Amended Complaint states simply that repeal of the Mandatory Underwriting Provisions has required MEDA to offer "more MEDA coaching time, per client," which "reduces MEDA's time available for other clients or activities." Am. Compl. ¶ 9. In other words, the Amended Complaint alleges that MEDA will be required to divert resources to clients affected by the repeal of the Mandatory Underwriting Provisions. There are no facts in the Amended Complaint suggesting that that implementation of the 2020 Revocation Rule will either "impair" MEDA's "ability to provide services" or "cause[] an actual 'inhibition of [MEDA's] daily operations, beyond the fact that it may be required to expend more resources. *Env't Working Grp.*, 301 F. Supp. 3d at 171. And, while the allegation that MEDA may be required to spend more resources in response to the 2020 Revocation Rule may be relevant to the second prong of the organizational injury test, it has no bearing on the first prong, whether MEDA will suffer an injury to its interests. *See* supra pp. 17–21; *Weingarten*, 468 F. Supp. 3d at 334 ("A diversion of resources 'is certainly relevant to step two'—whether the [the plaintiff] used resources to counteract the alleged harm to its activities. But step two is irrelevant unless the organization can show harm to its activities *distinct from* the diversion of resources.") (quoting *Ctr. for Responsible Sci.*, 346 F. Supp. 3d. at 41). Certainly, the Amended Complaint never alleges that MEDA will be denied any information or avenues for redress, which the D.C. Circuit has repeatedly held are the defining markers of an injury to an organization's interests. *See* supra pp. 19–21; *Ctr. for Biological Diversity*, 2020 WL 5702087 at *5 (explaining that, under D.C. Circuit precedent, "to establish an injury" an organization must allege "the denial of educational information [or] the inability to seek redress for a violation of the law").

Moreover, the Amended Complaint's allegation that repeal of the Mandatory Underwriting Provisions will require MEDA to invest additional resources into its one-on-one financial coaching program does not establish an organizational injury because providing financial coaching is precisely what MEDA already does.  The Amended Complaint asserts that MEDA "works to advance a national equity movement by building Latino prosperity, community ownership, and civic power," and "[t]o achieve this mission, MEDA offers free programs that include on-on-one financial coaching for clients."  Am. Comp. ¶ 9. NALCAB cannot manufacture standing by converting MEDA's routine programming (the provision of financial coaching) into an alleged injury.  *See* supra at pp. 22–24 (citing authority for the proposition that there is no injury where an organization alleges it will merely continue to do what it has always done).   Indeed, a plaintiff does not suffer a cognizable injury unless it is "forced … to expend resources in a manner that keeps it from pursuing [its] true purpose." *Nat'l Taxpayers Union*, 68 F.3d at 1434.  Here, the Amended Complaint acknowledges that MEDA's financial coaching program operates "[t]o achieve its mission." Am. Compl. ¶ 9.  And the Amended Complaint plainly states that MEDA will provide one-on-one financial coaching whether or not the Mandatory Underwriting Provisions go into effect. *Id.*  The expenditure of resources on financial coaching is, thus, a continuation of MEDA's standard operations and, therefore, insufficient to establish Article III injury.

        2.    <u>NALCAB Has Failed to Plausibly Allege That MEDA Has Used Any Resources to Counteract Any Purported Harm.</u>

Even if the Amended Complaint successfully alleged an injury to MEDA's organizational interests, the Court then must move to the second prong of the organizational injury inquiry and ask whether MEDA has used its resources to counteract that harm.  *See* supra pp. 26–28.  Specifically, the second prong of the test for organizational injury turns on whether MEDA

expended resources "for 'operational costs beyond those normally expended.'"  *Nat'l Ass'n of Home Builders*, 667 F.3d at 12 (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434).

      The Amended Complaint does not allege that the 2020 Revocation Rule will require MEDA to increase its overall operational expenditures.  Rather, it acknowledges that MEDA has previously devoted resources to "[p]roviding financial coaching to individuals with payday loans" and now that the Mandatory Underwriting Provisions have been repealed, its clients *continue* to need assistance and it *continues* to provide the same financial coaching. Am. Compl. ¶ 9.  In other words, the Amended Complaint says that the effect of the 2020 Revocation Rule has been that MEDA, like NALCAB, continues to invest the same resources into the same programming. Nothing has changed.

      Even comparing MEDA's expenditures with the Mandatory Underwriting Provisions not in effect against a hypothetical future where the Mandatory Underwriting Provisions are fully implemented, there is still no basis to believe that the 2020 Revocation Rule imposes higher operational costs on MEDA.  The Amended Complaint alleges that "[i]f the Payday Lending Rule's restrictions on no-underwriting lending went into effect, fewer MEDA coaching clients would be struggling with unaffordable payday loans," and as a result, "MEDA would be able to reduce the time it spends coaching clients" specifically "regarding payday loans." *Id.*  There is no allegation that implementation of the Mandatory Underwriting Provisions would result in an *overall* reduction in MEDA's expenditures.  To the contrary, the only effect, per the Amended Complaint, would be that "MEDA coaching staff would be able to help a greater number of clients" or, perhaps, "spend more time with existing clients." *Id.*  In other words, the Amended Complaint alleges only that the 2020 Revocation Rule may have caused MEDA to shift its expenditures among different clients and different types of financial coaching.  Nowhere does it allege that the

33

2020 Revocation Rule has caused MEDA to expend more resources overall than it otherwise would. Yet, an organization's diversion of resources without an overall increase in expenditures, as a matter of law, is not enough to establish organizational injury.

**CONCLUSION**

For all the foregoing reasons, the Court should dismiss this action for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

DATED:     March 22, 2021

<div style="margin-left:40%">

Respectfully submitted,

MARY McLEOD
General Counsel

JOHN R. COLEMAN
Deputy General Counsel

STEVEN Y. BRESSLER
Assistant General Counsel

KAREN BLOOM
Senior Counsel

 /s/ Ryan Cooper      
RYAN COOPER (D.C. Bar No. 1645301)
Counsel
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Telephone: 202-702-7541
Fax: 202-435-7024
Ryan.Cooper@cfpb.gov

</div>